**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

| | |
|---|---|
| **MARGARITA RODRIGUEZ-BONILLA,**<br>**as the Successor Personal Representative of the**<br>**ESTATE OF GREGORY LLOYD EDWARDS,** | **No.** |
| | **Judge:** |
| **Plaintiff,** | |
| **v.** | |
| **WAYNE IVEY,** | **CIVIL ACTION – LAW** |
| **DARRELL HIBBS,** | **JURY TRIAL DEMANDED** |
| **KELLY HAMAN,** | |
| **GEORGE FAYSON,** | |
| **RICHARD ZIMMERMAN,** | |
| **ROBERT WAGNER, JR.,** | |
| **FREDDY CEDENO,** | |
| **ALLISON BLAZEWICZ,** | |
| **JOSE J. ARMAS,** | |
| **JORGE GILLETTE,** | |
| **DEBORA NADEAU,** | |
| **AYANA ROBINSON,** | |
| **YOLANDA JONES,** | |
| **BREVARD COUNTY SHERIFF'S OFFICE, and** | |
| **ARMOR CORRECTIONAL HEALTH SERVICES, INC.,** | |
| | |
| **Defendants.** | |

## COMPLAINT

AND NOW comes the Plaintiff, MARGARITA RODRIGUEZ-BONILLA, as the Successor Personal Representative of the ESTATE OF GREGORY LLOYD EDWARDS, by and through her undersigned counsel, DEVON M. JACOB, ESQUIRE, and the law firm of JACOB LITIGATION, INC., and BENJAMIN L. CRUMP, ESQUIRE, and the law firm of BEN CRUMP LAW, PLLC, and avers as follows:

**I.  JURISDICTION AND VENUE**

1

1.     This action is brought pursuant to Florida and federal law.

2.     Jurisdiction is founded upon Florida Statute § 48.193(a)(2) (concerning tortious acts committed in the State of Florida).

3.     Pursuant to Florida Statute § 47.021 (actions against defendants residing in different counties) and § 47.051 (actions against corporations)  venue is proper in this Court, as Defendant Armor Correctional Health Services, Inc., maintains its headquarters in Miami, Florida.

4.     Plaintiff seeks damages well in excess of the $30,000 jurisdictional threshold for this Court.

## II. IDENTIFICATION OF PARTIES AND MATERIAL WITNESSES

5.     The Decedent is GREGORY LLOYD EDWARDS ("EDWARDS"), an adult, who died on December 10, 2018, at the age of 38, in Brevard County, Florida.

6.     Plaintiff, MARGARITA RODRIGUEZ-BONILLA ("BONILLA"), is an adult, who is domiciled in the Commonwealth of Virginia. On October 23, 2020, the Probate Division of the Circuit Court of the 18th Judicial Circuit in and for Brevard County, Florida, issued Amended Letters of Administration, appointing BONILLA, Successor Personal Representative of the Estate of the ESTATE OF GREGORY LLOYD EDWARDS ("ESTATE"). BONILLA asserts claim on behalf of the ESTATE and BENEFICIARIES as permitted by law.

7.     Defendant, WAYNE IVEY ("IVEY"), is an adult, who during all relevant times, was employed by Brevard County, as a Sheriff. Sheriff Ivey is sued in his individual and official capacities.

8.     Defendant, DARRELL HIBBS ("HIBBS"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy, with the rank of Commander. HIBBS is sued in his individual and official capacities.

9.       Defendant, KELLEY HAMAN ("HAMAN"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy, with the rank of Major. HAMAN is sued in her individual capacity.

10.     Defendant, GEORGE FAYSON ("FAYSON"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy, with the rank of Lieutenant. FAYSON is sued in his individual capacity.

11.     Defendant, RICHARD ZIMMERMAN ("ZIMMERMAN"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy, with the rank of Sergeant. ZIMMERMAN is sued in his individual capacity.

12.     Defendant, ROBERT WAGNER, JR. ("WAGNER"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Deputy and a Field Training Officer ("FTO"). WAGNER is sued in his individual capacity.

13.     Defendant, FREDDY CEDENO ("CEDENO"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Corrections Deputy. CEDENO is sued in his individual capacity.

14.     Defendant, ALLISON BLAZEWICZ ("BLAZEWICZ"), is an adult, who during all relevant times, was employed by the Brevard County Sheriff's Office, as a Corrections Deputy. BLAZEWICZ is sued in her individual capacity.

15.     Defendant, JOSE J. ARMAS ("ARMAS"), is an adult, who during all relevant times, was employed by Armor Correctional Health Service, Inc., as a physician and President, and an agent of the Brevard County Sheriff's Office. ARMAS is sued in his individual and official capacities.

16.     Defendant, JORGE GILLETTE ("GILLETTE"), is an adult, who during all relevant times, was employed by, or an agent of, Armor Correctional Health Service, Inc., and/or Brevard County Sheriff's Office, as a physician. GILLETTE is sued in his individual and official capacities.

17.     Defendant, DEBORA NADEAU ("NADEAU"), is an adult, who during all relevant times, was employed by, or an agent of, Armor Correctional Health Service, Inc., and/or Brevard County Sheriff's Office, as a licensed practical nurse. NADEAU is sued in her individual capacity.

18.     Defendant, AYANA ROBINSON ("ROBINSON"), is an adult, who during all relevant times, was employed by, or an agent of, Armor Correctional Health Service, Inc., and/or Brevard County Sheriff's Office, as a licensed practical nurse. ROBINSON is sued in her individual capacity.

19.     Defendant, YOLANDA JONES ("JONES"), is an adult, who during all relevant times, was employed by, or an agent of, Armor Correctional Health Service, Inc., and/or Brevard County Sheriff's Office, as a licensed practical nurse. JONES is sued in her individual capacity.

20.     Defendant, BREVARD COUNTY SHERIFF'S OFFICE ("SHERIFF'S OFFICE"), is located at 700 S. Park Avenue, Titusville, FL 32780. The SHERIFF'S OFFICE operates the Brevard County Jail Complex, located at 860 Camp Road, Cocoa, FL 32927.

21.     Defendant, ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("ARMOR"), is a for profit corporation with a principle address of 4960 SW 72nd Avenue, Suite 400, Miami, FL33155, registered with the Florida Department of State Division of Corporations. ARMOR'S registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

### III. <u>MATERIAL FACTS</u>

22.     GREGORY LLOYD EDWARDS ("EDWARDS") was a military veteran who served as a combat medic.

23.     As a result of his military service, EDWARDS suffered from Post-Traumatic Stress Disorder ("PTSD").

### A. <u>Gregory Edwards Arrested: Mental Health: Determined to be Danger to Self and/or Others.</u>

24.     On Sunday, December 9, 2018, at approximately 11:15 AM, EDWARDS suffered a PTSD mental health emergency while in the parking lot of the Walmart Supercenter, 845 Palm Bay Road NE, West Melbourne, FL 32904, causing a disturbance.

25.     West Melbourne Police Officers responded to the location and placed EDWARDS under arrest for various criminal and probation related offenses.

26.     During their on-scene investigation, West Melbourne Police Officers were advised:

a.     EDWARDS suffered from PTSD, was not taking his prescribed medications, had been acting strange for several days, and had not slept in four days.

b.     EDWARDS' was experiencing a "psychotic episode," and his wife was concerned that EDWARDS might harm himself.

c.     EDWARDS was scheduled for an appointment the next day with the VA Hospital.

27.     West Melbourne Police Officers determined that EDWARDS suffered from a mental illness, was presently a danger to himself and/or others, and required a mental health examination.

28.    As such, West Melbourne Police Officers prepared a Baker Act Form-52[1] for the purpose of obtaining an emergency involuntary examination for Edwards.

## B.  <u>Gregory Edwards Taken to Jail Not Hospital: Jail Accepts Edwards.</u>

29.    A West Melbourne Police Officer transported EDWARDS to the Brevard County Jail Complex ("Jail").

30.    EDWARDS was not medically cleared before he was transported to the Jail.

31.    Sgt. RICHARD ZIMMERMAN ("ZIMMERMAN") and FTO ROBERT WAGNER, JR. ("WAGNER") brought EDWARDS into the Jail and spoke with the transporting officer.

32.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

        a.    The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER all information known to the West Melbourne Police Department regarding EDWARDS' medical condition;

        b.    The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER all information known to the West Melbourne Police Department regarding the facts and circumstances that resulted in EDWARDS being taken into custody;

---

[1] The Florida Mental Health Act of 1971, commonly known as the "Baker Act," authorizes among others, a law enforcement officer, to require an emergency involuntary institutionalization and examination of an individual.

   c. The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS was suffering from a serious medical emergency requiring immediate medical treatment;

   d. The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS suffered from a mental illness;

   e. The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS was a danger to himself or others;

   f. The West Melbourne Police Officer who transported Edwards communicated to Sgt. ZIMMERMAN and FTO WAGNER that EDWARDS needed immediate emergency medical care authorized by the Baker Act.

33. On Sundays, the Brevard County Jail Complex is not equipped or staffed to provide the immediate emergency medical care authorized by the Baker Act, and necessary to treat EDWARDS' serious medical condition.

34. Despite knowing the aforementioned, corrections personnel agreed to take custody of EDWARDS.

35. As a result, EDWARDS did not timely receive the emergency medical care authorized by the Baker Act, and necessary to treat his serious medical condition.

36. As a further result, EDWARDS' already serious medical condition continued to deteriorate.

37. The deliberate failure to provide EDWARDS with necessary and timely emergency medical care while EDWARDS was in custody was a substantial cause of EDWARDS' death.

38.    When EDWARDS arrived at the Jail, he appeared dazed and confused, but was compliant.

39.    EDWARDS changed into an orange Jail jumpsuit, and instead of being provided with necessary medical care, he was placed in holding cell 7, reportedly to calm down from the Walmart incident.

### C.  Major Kelly Haman: Notified of Gregory Edwards' Physical and Mental Condition: Edwards Mental Health Deteriorates While He Is Ignored For Approximately 30 Minutes.

40.    Major KELLY HAMAN ("HAMAN") saw EDWARDS in cell 7, and upon inquiry to deputies, was informed that EDWARDS had been arrested after a use of force.

41.    For approximately 30 minutes, no one checked on EDWARDS.

42.    During that period of time, EDWARDS' mental status deteriorated.

43.    Specifically, on a security video, EDWARDS can be observed talking to himself, staring at the wall, and appearing to change between calm and irritated moods.

44.    FTO WAGNER entered the cell to provide EDWARDS with a bagged lunch, and observed EDWARDS' agitated state.

45.    EDWARDS engaged in various types of exercises, shadow boxing, throwing his lunch around, and pacing.

46.    EDWARDS became increasingly agitated, culminating in EDWARDS banging on the cell door window in an apparent attempt to gain the attention of deputies who had been ignoring him.

### D. Cpl. Brian Otto and Edwards: Physical Altercation.

47.     Cpl. Brian Otto ("Otto") came to cell 7 to retrieve EDWARDS to continue with the Booking process, alone.

48.     Otto recognized that EDWARDS was not mentally well, as evidenced by his later statement to investigators that EDWARDS was "not processing" when he took him from the cell.

49.     While being escorted by Otto, EDWARDS shook his left arm in an apparent failed attempt to remove Otto's hand from his shoulder.

50.     EDWARDS made movements appearing to prepare to strike Otto but he did not do so.

51.     Apparently intending to take EDWARDS to the ground, Otto responded with a failed leg sweep.

52.     Otto ended up causing both EDWARDS and himself to fall to the ground.

53.     When he did so, Otto appeared to bang his head on the ground.

54.     On the way to the ground, EDWARDS appeared to throw a punch that did not connect.

55.     FTO WAGNER, apparently trying to tackle EDWARDS, ended up tripping over EDWARDS, providing EDWARDS with an opportunity to strike Otto twice in the back of his head.

### E. Supervisors Arrive on Scene: Direct Excessive Force.

56.     Sgt. ZIMMERMAN, apparently attempting to apply a wrist lock technique on EDWARDS, ended up instead causing Otto's head to become stuck under EDWARDS' arm.

57.     WAGNER punched EDWARDS with a closed fist several times in one of his legs and back, while Deputy Shannon Popielarczyk ("Popielarczyk") held EDWARDS' legs.

58.     Deputy FREDDY CEDENO ("CEDENO") took over Popielarczyk's position.

59.     Otto freed himself, pepper sprayed EDWARDS, and then deployed several hard strikes to EDWARDS' torso, before walking away.[2]

60.     Shift commander, Lt. GEORGE FAYSON ("FAYSON"), responded to the location, called for more deputies to respond, and then instead of supervising, delivered several knee strikes to one of EDWARDS' upper thighs.

61.     Due to the lack of skilled supervision, the incident devolved into a deputy pile-on of EDWARDS.

62.     At one point, approximately nine deputies, each vying for a place in the pack, proceeded to use force against EDWARDS.

63.     The mob excitement is apparent even on the silent security video where deputies can be seen trying to get in on the action.

64.     Based on the number of deputies engaged in an aggressive but uncoordinated use of force against EDWARDS, it was impossible for EDWARDS to comply with any request to move in any manner.

65.     Yet, the deputies continued to swarm around EDWARDS, crushing, twisting, and striking his body and extremities, until EDWARDS disappears under the attacking group.

66.     Major HAMAN instructed Deputy ALLISON BLAZWICZ ("BLAZWICZ") to use her Model X26 Taser against EDWARDS, and authorized multiple deployments.

67.     BLAZWICZ fired her Taser into EDWARDS' lower back and then used the Taser in drive-stun mode against EDWARDS.

---

[2] Notably, and inexcusably, Sheriff Ivey, the Major Crimes Unit, Staff Services Unit, and FDLE, all relay a version of the events that does not track the security video.

68.    The Taser log recorded 6 trigger pulls – a total activation time of 49 seconds – over just a 1 minute and 33 seconds period of time.

69.    Three of the trigger pulls were for 5 seconds, and three of the trigger pulls ranged from 10-13 seconds.

70.    ZIMMERMAN placed EDWARDS' head between his knees and applied a pressure point technique on EDWARDS.

71.    Dashawn Edward ("Edward") assisted in applying handcuffs to EDWARDS.

72.    Approximately five minutes into the use of force incident, EDWARDS was handcuffed to the rear.

### F.    Supervisors Orders: Restraint Chair and Spit-Mask: But No Decontamination and No Medical Assessment: False Armor Medical Records.

73.    Lt. FAYSON directed that EDWARDS be secured in a restraint chair.

74.    Lt. FAYSON further directed that EDWARDS remain handcuffed to the rear while he was restrained in the restraint chair.

75.    Four deputies lifted a visibly limp-bodied (but alive) EDWARDS from the floor and placed him into the restraint chair.

76.    Despite EDWARDS' non-resistance, ZIMMERMAN held EDWARDS' head and applied a pressure point technique to EDWARDS while he was being restrained in the restraint chair.

77.    FTO WAGNER punched EDWARDS several times in the leg, claiming EDWARDS would not permit his leg to be restrained.

78.   It is likely that any perceived resistance to being further restrained was likely just a reflexive response to the unnecessary pressure point force techniques being applied.

79.   Up to seven deputies participate in restraining EDWARDS in the restraint chair while his arms were still handcuffed to the rear and the Taser barbs remain lodged in his lower back.

80.   Despite the fact that EDWARDS was no longer resisting, and was not spitting, Major HAMAN directed that a spit-mask be placed over EDWARDS' head.

81.   With Lt. FAYSON and Major HAMAN observed, Deputy CEDENO and ZIMMERMAN placed a spit-mask over EDWARDS' head without first decontaminating him from the pepper spray.

82.   All of the Defendants present should have understood that the prolonged Taser use, coupled with mechanical asphyxiation and physical assault, likely increased the lactic acid accumulating in EDWARDS' body.

83.   Despite official reports indicating otherwise, at no time did a nurse check the restraint chair straps as required by policy to ensure that EDWARDS' breathing and circulation were not impaired.

84.   Despite having not performed an assessment, Nurse DEBORA NADEAU ("NADEAU") indicated in the medical record that EDWARDS' CMS (circulation, motion, and sensation) were intact, and that his respiratory status was unlabored.

85.   Nurse AYANA ROBINSON ("ROBINSON") indicated in the medical record that while EDWARDS was restrained in the restraint chair he was spitting.

86.   However, this was merely an assumption that Nurse ROBINSON had made from the fact that he was wearing a spit-mask.

87.     Both Nurses, YOLANDA JONES ("JONES") and ROBINSON, noted in the medical record that EDWARDS was disoriented and confused but then failed to perform a medical assessment of his medical condition.

### G. Wheeled Into Cell 9: Door Closed: Not Monitored: Allowed to Slowly Suffocate to Death Alone.

88.     About 10 minutes after EDWARDS was restrained in the restraint chair, Deputy EDWARD wheeled EDWARDS into holding cell 9, and at 2:07 PM, closed the cell door.

89.     WAGNER has since admitted that while EDWARDS could be seen by people who were working in Booking, no supervisor assigned anyone to monitor EDWARDS while he was in cell 9.

90.     For the next 16 minutes, EDWARDS struggled and flexed against the restraints.

91.     EDWARDS visibly struggled to breathe – his mouth open against the spit-mask material.

92.     Deputies ignored EDWARDS while he struggled alone.

93.     EDWARDS' inability to breathe deeply and unrestricted likely further complicated any lactic acid issue that had developed.

94.     At 2:16 PM, Nurse NADEAU and FTO WAGNER peered into the cell through the cell door window for approximately seven seconds.

95.     NADEAU told investigators that she heard EDWARDS yelling.

96.     Despite knowing that EDWARDS had arrived at the facility in an agitated and combative state; had engaged in a significant physical altercation with numerous guards; had been subjected to the use of a Taser and pepper spray, and had not yet been decontaminated; was restrained in a restraint chair with his hands handcuffed behind him; had Taser barbs still in his back, and a spit-mask on his head; and had not had vital signs checked after the altercation, or his

13

respiratory status assessed after being exposed to pepper spray; NADEAU, who was assigned to Booking, failed to initially assess Edwards or continually monitor his medical condition.

97.     Instead, NADEAU walked away, again leaving EDWARDS alone.

98.     Despite not assessing EDWARDS, NADEAU indicated in the medical records that EDWARDS was alert and oriented.

99.     EDWARDS' desperation and distress visibly increased.

100.    EDWARDS' moved his head to the side and back, his mouth continued to be open, and his legs pulled against the restraints.

101.    EDWARDS threw his head forward several times and his chest flexed.

102.    Six minutes after NADEAU walked away from the struggling EDWARDS, EDWARDS fell limp; except for periodic twitching.

### H. Gregory Edwards: Unresponsive: Priority One: Remove Taser Barbs?: Wheeled to Medical Unit Instead of Transferred to Hospital.

103.    At approximately 2:23 PM, after personnel finally discovered EDWARDS' new medical emergency, the cell door opened and personnel enter.

104.    Lt. FAYSON removed the spit-mask from EDWARDS and WAGNER administered a sternum rub, which yielded no response.

105.    Instead of providing EDWARDS with immediate necessary emergency medical care, deputies loosened the restraint chair straps and worked for several minutes to remove the Taser barbs from EDWARDS' back.

106.    It was not until 2:26 PM that NADEAU entered the cell and administered a sternum rub, which again yielded no response.

107.    This was the first time that NADEAU conducted any assessment of EDWARDS.

108.    Despite being unresponsive to painful stimuli, EDWARDS was left in the restraint chair and NADEAU administered oxygen with a non-rebreather mask.

109.    In the medical records, however, NADEAU failed to report her use of a sternal rub and EDWARDS' failure to respond to painful stimuli.

110.    Instead, NADEAU reported that EDWARDS was unresponsive, and that she applied an oxygen mask.

111.    She further reported that EDWARDS' chest was moving and he was blinking his eyes but that he was not responsive to verbal commands.

112.    Finally, she indicated that EDWARDS' oxygen saturation was 98% but failed to note that EDWARDS was being administered oxygen at 15L.

113.    Both Nurses, JONES and ROBINSON, similarly reported that they observed EDWARDS in the restraint chair, unresponsive, with an oxygen mask on his face, with shallow breathing.

114.    Instead of insisting that 911 be initiated immediately to have EDWARDS transferred to a hospital for necessary emergency medical care, NADEAU, JONES, and ROBINSON, permitted security officers to transport EDWARDS, unresponsive and still restrained in the restraint chair, with oxygen, to the medical unit for further evaluation by the charge nurse.

115.    EDWARDS was left in the restraint chair for 10 minutes before he was removed to be transported to medical.

116.    Due to the security doors in place on the path to the medical unit, it would have taken an estimated three to five minutes for EDWARDS to be transferred from Booking to the Medical Unit.

I.    **Heartrate Slows to a Stop, and Then Restarted: Hypoxic Brain Injury: Both Evidence of Suffocation.**

117.   NADEAU failed to communicate to the charge nurse the entirety of her knowledge regarding what had transpired with EDWARDS between the time that he arrived at the facility and then arrived in the medical unit.

118.   Upon arrival in the medical unit, oxygen was being administered at 15L via a non-rebreather mask with EDWARDS having only very shallow breathing.

119.   The charge nurse performed a sternum rub with no response.

120.   Recognizing the dire situation, the charge nurse immediately advised a Sergeant to call 911.

121.   JONES reported that EDWARDS' breathing was shallower when he arrived in medical than when he left Booking.

122.   Shortly after arriving in the Medical Unit, EDWARDS went into respiratory arrest.

123.   EDWARDS was removed from the restraint chair and placed on a backboard.

124.   At 2:38 PM, CPR was initiated.

125.   At 2:49 PM, Brevard County Fire Rescue EMS arrived and took over medical care.

126.   Once EMS arrived and took over care, the charge nurse called NADEAU in Booking to gather more information on EDWARDS.

127.   NADEAU reported that Edwards was "fine" when he left Booking.

128.   In the event that that were true, the oxygen administration should not have been set at 15L, as oxygen toxicity (oxygen poisoning) could result, which could in turn cause respiratory depression, respiratory arrest, and in severe cases, death.

129.   In the alternative, if EDWARDS' medical condition when he left Booking was such that 15L of oxygen was appropriate, 911 should have been initiated and EDWARDS should have been immediately transferred from Booking to a hospital for emergency medical treatment.

16

130.    Approximately 20 minutes later, EDWARDS was removed from the Jail to be transferred to the Rockledge Regional Medical Center.

131.    EDWARDS' breathing and heart slowed to a stop.

132.    Prior to his arrival at the hospital, however, EDWARDS' pulse returned.

133.    EDWARDS arrived at the hospital with a hypoxic brain injury.

134.    EDWARDS was placed on life support.

135.    On December 10, 2018, at 8:00 PM, EDWARDS was pronounced dead.

136.    All available evidence supports the conclusion that while the Defendants failed to monitor EDWARDS, he suffocated very slowly and painfully to death, and for much of the time, was conscious and very much aware of his impending death.


## J. <u>Crime Scene Not Secured: Material Evidence in Death Investigation – Spit-Mask – Discarded.</u>

137.    Despite being the law enforcement agency initially responsible for conducting the death investigation, the Sheriff Defendants failed to secure the crime scene.

138.    In addition, WAGNER directed an inmate to clean cell 9.

139.    Before doing so, HAMAN, FAYSON, ZIMMERMAN, and/or WAGNER never had the crime scene processed in accordance with standard investigation techniques in the industry.

140.    The inmate who cleaned cell 9 discarded the spit-mask that was used on EDWARDS.

141.    As a result, the condition of the spit-mask, i.e., the breathability of the material, whether the material was covered with body fluids, etc., could not be assessed.

**K. Sheriff Wayne Ivey and Commander Darrell Hibbs: Brevard County Sheriff's Office: Deficient Policies and Training.**

142.    Sheriff WAYNE IVEY ("IVEY") is the duly elected Sheriff of Brevard County.

143.    Sheriff IVEY is the final policymaker for the BREVARD COUNTY SHERIFF'S OFFICE ("SHERIFF'S OFFICE") and the Jail.

144.    Commander DARRELL HIBBS ("HIBBS") is the Commander of the Jail.

145.    Commander HIBBS is a policymaker for the Jail.

146.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement supervisor policies and/or training for the jail that met the industry standard.

b.    Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement intake and booking policies and/or training that met the industry standard.

c.    Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement medical screening policies and/or training that met the industry standard.

d.    Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement mental health and Baker Act policies and/or training that met the industry standard.

e.    Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE permitted the use of pepper spray, electronic control weapons, restraint chairs, and spit-masks, without first verifying the safety of each devices, or the safety of the use of the devices in combination.

f.    Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE permitted the use of pepper spray, electronic control weapons, restraint chairs, and spit-masks, in the Jail but

failed to first implement policies and/or training that met the industry standard to insure the health and safety of inmates and to protect inmates' rights.

g.      Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement inmate monitoring policies and/or training that met the industry standard.

h.      Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement medical policies and/or training that met the industry standard to ensure that inmates received timely emergency medical care.

i.      Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement internal affairs policies and/or training that met the industry standard to ensure that policy, training, or operational deficiencies are timely discovered and corrected.

j.      Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly failed to implement independent death investigation policies and/or training that met the industry standard to ensure that policy, training, or operational deficiencies are timely discovered and corrected.

k.      Sheriff IVEY, Commander HIBBS, and SHERIFF'S OFFICE knowingly created a non-transparent culture that in addition to creating public distrust, resulted in policy, training, and operational deficiencies not being timely discovered and corrected.

147.    NADEAU admits that she never assessed EDWARDS because of an unwritten "rule" that she was not to assess inmates until deputies told her that it was safe for her to come out of her office to do so.

148.    NADEAU advised that no deputy ever told her that it was safe to assess EDWARDS.

19

149.    On May 15, 2019, FAYSON submitted a notice of retirement to be effective June 3, 2019, a date prior to the completion of the administrative investigation.

### L.  Armor Correctional Health Services, Inc.: Very Long History of Deliberate Indifference to Health and Safety of Inmates.

150.    DR. JOSE J. ARMAS ("ARMAS") is the founder and president of ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("ARMOR"), a for profit corporation, with yearly profits reaching just shy of $90 million in some recent years.

151.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

        a.      DR. ARMAS has been accused of using political contributions to obtain lucrative government contracts.

        b.      ARMOR has been accused of cutting costs by providing deficient medical care to increase corporate profits.

        c.      DR. ARMAS has received millions of dollars in dividends from ARMOR.

        d.      Prior to EDWARDS' death, ARMOR had at least a decade long history riddled with approximately 30 lawsuits alleging that ARMOR contributed to causing deaths through deficient medical care.

        e.      ARMOR had contracts not renewed due to the alleged failure to meet contractual obligations related to the provision of medical care.

        f.      ARMOR is believed to have paid tens of millions of dollars to settle legal claims alleging deficient medical care resulting in injury and/or death.

        g.      ARMOR has been the subject of government investigations and criminal charges.

h.      Through the aforementioned complaints, DR. ARMAS and ARMOR were on notice for many years prior to EDWARDS' death that ARMOR failed to provide medical intake, medical assessments, mental health services, physician involvement, and hospital referrals, in accordance with industry standards, resulting in injuries and/or death.

i.      The aforementioned deficiencies, however, were never remedied.

j.      DR. JORGE GILLETTE ("GILLETTE") was the sole physician overseeing the provision of medical care at the Jail on behalf of ARMOR, SHERIFF IVEY, and SHERIFF'S OFFICE.

k.      DR. GILLETTE knew of the same healthcare deficiencies existing at the Jail but failed to remedy the deficiencies.

IV. **CLAIMS**

**Count I**

**Plaintiff v. Defendants, Haman, Fayson,**
**Wagner, Zimmerman, Cedeno, Blazewicz, Nadeau, Robinson, and Jones**
**Objectively Unreasonable Force**
*Fourteenth Amendment – Due Process (Pursuant to 42 U.S.C. § 1983)*

152.    Paragraphs 1 to 151 are incorporated herein by reference.

153.    EDWARDS was a pretrial detainee.

154.    All Defendants named herein were state actors.

155.    A pretrial detainee's Fourteenth Amendment excessive-force claim is governed by a rule of "objective reasonableness." Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015) ("[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."); Piazza v. Jefferson Cty., 923 F.3d 947, 951 (11th Cir. 2019).

156.    The Defendants used the following objectively unreasonable uses of force either individually or collectively:

a.      Permitted more persons than necessary to simultaneously use uncoordinated force against EDWARDS;

b.      Used or permitted uses of force that did not comply with training;

c.      Used or permitted excessive use of an electronic control weapon on EDWARDS;

d.      Authorized or placed EDWARDS in a restraint chair while his hands were still handcuffed to the rear;

e.      Failed to decontaminate EDWARDS after exposing him to pepper spray;

f.      Authorized or placed a spit-mask over EDWARDS' head without first decontaminating him from pepper spray;

22

g.      Left EDWARDS restrained with a spit-mask on his head, while he suffered from a medical emergency;

h.      Caused or permitted EDWARDS to slowly suffocate and suffer for in excess of 16 minutes, until he was rendered unconscious;

i.      Authorized or failed to remove EDWARDS from restraints while he suffered from a medical emergency.

157.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

## Count II

**Plaintiff v. Defendants, Haman, Fayson,**
**Wagner, Zimmerman, Cedeno, Blazewicz, Nadeau, Robinson, and Jones**
**Deliberate Indifference to Serious Medical Needs**
*Fourteenth Amendment – Due Process (Pursuant to 42 U.S.C. § 1983)*

158.    Paragraphs 1 to 151 are incorporated herein by reference.

159.    EDWARDS was a pretrial detainee.

160.    All Defendants named herein were state actors.

161.    In order to prove deliberate indifference to a serious medical need, a Plaintiff must demonstrate (1) a government official's subjective knowledge of a risk of serious harm; (2) the government official's disregard of the risk; (3) by conduct that is more than mere negligence. See Nam Dang, by and through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1280 (11th Cir. 2017).

162.    Deliberate indifference may be established by a failure to provide medical care and/or by excessive delay in providing medical care. Lelieve v. Chief of Police Manuel Oroso, 846 F.Supp.2d 1294, 1304 (S.D. Fla. Feb. 14, 2012).

163.   Each Defendant understood that EDWARDS suffered from a mental illness and was a danger to himself or others.

164.   Each Defendant knew that EDWARDS needed immediate emergency medical care but deliberately failed to provide EDWARDS with access to the requisite care.

165.   Each Defendant knew that EDWARDS had not received a medical assessment.

166.   Despite knowing that EDWARDS had arrived at the facility in an agitated and combative state; had engaged in a significant physical altercation with numerous guards; had been subjected to the use of a Taser and pepper spray, and had not yet been decontaminated; was restrained in a restraint chair with his hands handcuffed behind him; had Taser barbs still in his back, and a spit-mask on his head; and had not had vital signs checked after the altercation, or his respiratory status assessed after being exposed to pepper spray; the Defendants failed to continually monitor his medical condition.

167.   The Defendants failed to timely transfer EDWARDS to a hospital for emergency medical care.

168.   As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

## Count III

**Plaintiff v. Defendants Fayson, Haman, Zimmerman, and Wagner**
***Fourteenth Amendment – Supervisory Liability (Pursuant to 42 U.S.C. § 1983)***

169.   Paragraphs 1 to 151 are incorporated herein by reference.

170.   EDWARDS was a pretrial detainee.

171.   All Defendants named herein were state actors.

172.   "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the

supervising official and the alleged constitutional deprivation." <u>Brown v. Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990).

173.    Haman, Fayson, Zimmerman, and Wagner, were supervisors.

174.    Haman, Fayson, Zimmerman, and Wagner, personally participated in causing EDWARDS' constitutional injuries.

175.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

<u>**Count IV**</u>

**Plaintiff v. Defendants, Haman, Fayson,
Wagner, Zimmerman, Cedeno, Blazewicz, Nadeau, Robinson, and Jones
*Fourteenth Amendment – Duty to Intervene (Pursuant to 42 U.S.C. § 1983)***

176.    Paragraphs 1 to 151 are incorporated herein by reference.

177.    EDWARDS was a pretrial detainee.

178.    All Defendants named herein were state actors.

179.    To establish a failure to intervene claim, a Plaintiff must establish that a Defendant officer was in a position to intervene to stop another officer's unlawful conduct and had an appreciable opportunity to do so. <u>See</u> Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996)

180.    The Defendants each had an appreciable opportunity and duty to intervene to stop each other's unlawful conduct but failed to do so.

181.    The Defendants each had an appreciable opportunity and duty to intervene on EDWARDS' behalf to ensure his physical and medical safety but failed to do so.

182.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

**Count V**

**Plaintiff v. Defendants, Ivey, Hibbs,
Armas, Gillette, Armor, and Sheriff's Office
Policies, Practices, and Customs
*Fourteenth Amendment – Monell (Pursuant to 42 U.S.C. § 1983)*

183.     Paragraphs 1 to 151 are incorporated herein by reference.

184.     EDWARDS was a pretrial detainee.

185.     All Defendants named herein were state actors.

186.     The Defendants deliberately implemented or failed to implement policies and practices as discussed above, which was the moving force that caused EDWARDS' constitutional injuries.

187.     As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

**Count VI**

**Plaintiff v. Individual Defendants
Willful and Wanton Negligence
(Pursuant to Fla. Stat. § 768.28)**

188.     Paragraphs 1 to 151 are incorporated herein by reference.

189.     EDWARDS was a pretrial detainee in the care, custody, or control of the Individual Defendants.

190.     Each Individual Defendant either directly or indirectly owed EDWARDS a duty to exercise reasonable care in safeguarding EDWARDS while he was in the custody of ARMOR, SHERIFF'S OFFICE, and Jail, and to refrain from acting in a manner exhibiting wanton and/or willful disregard for EDWARDS' human rights and/or safety. See Fla. Stat. § 768.28(9)(a).

191.     As specifically discussed above, the Individual Defendants each breached this duty by wantonly and/or willfully disregarding EDWARDS' human rights and/or safety.

192.     As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

193.     Plaintiff, decedent, and decedent's survivors have therefore suffered damages recoverable through Florida's Wrongful Death and/or Survival Statutes, including, but not limited to: loss of consortium; decedent's catastrophic bodily harm; pain and suffering; death; and all other damages available by law.

## Count VII

**Plaintiff v. Defendants, Ivey, Hibbs, Armas, and Gillette**
**Negligence**
**(Pursuant to Fla. Stat. § 768.28)**

194.     Paragraphs 1 to 151 are incorporated herein by reference.

195.     EDWARDS was a pretrial detainee in the care, custody, or control of the Individual Defendants.

196.     Sheriff IVEY, Commander HIBBS, Dr. ARMAS, and Dr. GILLETTE, in their official capacities as the policymakers, owners, or high executives of SHERIFF'S OFFICE and/or ARMOR, bear legal responsibility for the conduct, acts, and omissions of their agents and employees, including, for the purposes of this action, the Individual Capacity Defendants. See Fla. Stat. § 768.28.

197.     Sheriff IVEY, Commander HIBBS, Dr. ARMAS, and Dr. GILLETTE, by and through the Individual Capacity Defendants, owed EDWARDS a duty of ordinary care.

198.     As specifically alleged above, Sheriff IVEY, Commander HIBBS, Dr. ARMAS, and Dr. GILLETTE, by and through the Individual Capacity Defendants, breached this duty of care by and through these Defendants' careless execution of job responsibilities.

199.    As a direct and proximate cause of the Defendants' actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

200.    Plaintiff, decedent, and decedent's survivors have therefore suffered damages recoverable through Florida's Wrongful Death and/or Survival Statutes, including, but not limited to: loss of consortium; decedent's catastrophic bodily harm; pain and suffering; death; and all other damages available by law.

### Count VIII

**Plaintiff v. Defendants**
*Wrongful Death*
*(Pursuant to Florida's Wrongful Death Act, Fla. Stat. §§ 768.16, et seq.)*

201.    Paragraphs 1 to 151 are incorporated herein by reference.

202.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

203.    As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS' survivors suffered emotional and financial injuries.

204.    Plaintiff asserts this wrongful death action on behalf of EDWARDS' survivors to recover wrongful death damages as provided by Florida law.

205.    No other legal action has been initiated on behalf of EDWARDS' survivors related to the conducted discussed herein.

### Count IX

**Plaintiff v. Defendants, Ivey, Sheriff's Office, and Armor**
**Vicarious Liability**
*(Pursuant to Florida State Law)*

206.    Paragraphs 1 to 151 are incorporated herein by reference.

207.     Sheriff IVEY, SHERIFF'S OFFICE, and ARMOR, are vicariously liable for the actions of their agents and employees who cause injury to others while acting in the course and scope of their employment.

208.     As a direct and proximate cause of the Defendants' aforementioned actions, EDWARDS suffered emotional and physical injury, physical pain and suffering, and ultimately, death.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor as follows:

A.      Declaratory Judgment: That this Court declare that the Defendants' actions violated EDWARDS' Fourteenth Amendment rights and EDWARDS and his survivors' rights guaranteed by Florida state law;

B.      Compensatory Damages: violation of rights, conscious physical pain and suffering, embarrassment, humiliation, fear, death, loss of enjoyment of life, hedonic damages, and the loss of companionship from family;

C.      Punitive Damages (for federal claims only against Individual Defendants only);

D.      Reasonable attorney's fees and costs;

E.      Pre and Post Judgment Interest;

F.      Such other financial or equitable relief as is reasonable and just.

<u>**Jury Trial Demand**</u>

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

/s/ Devon M. Jacob, Esquire                                          **Date: 12/8/2020**
**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D. 89182
**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Plaintiff's Counsel) (Pro Hac Vice to be filed)


 _/s/ Benjamin L. Crump, Esquire__
**BENJAMIN L. CRUMP, ESQUIRE**
FL Bar: 72583
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, Florida 32301
(850) 224-2023 | Court@bencrump.com
(Plaintiff's Local Counsel)