UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARGARITA RODRIGUEZ-BONILLA
*as the Successor Personal Representative*
*of the Estate of Gregory Lloyd Edwards,*

        Plaintiff,               CASE NO. 6:21-cv-00428-JA-GJK

vs.

WAYNE IVEY, GEORGE FAYSON,
RICHARD ZIMMERMAN, ROBERT
WAGNER, JR., DEBORA NADEAU,
AYANA ROBINSON, YOLANDA JONES,
and ARMOR CORRECTIONAL HEALTH
SERVICES, INC.,

        Defendants.

_____/

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Margarita Bonilla Rodriguez on behalf of the Estate of Gregory Edwards, submits her Memorandum in Opposition to the Motion for Summary Judgment ("Motion") filed by the medical defendants Armor Correctional Health Services, Inc. ("Armor"), Debora Nadeau, Yolanda Jones, and Ayana Robinson.

## I.    Introduction

On December 9, 2018, Gregory Edwards, a decorated former U.S. Army medic, died in the Brevard County Jail. He is survived by his wife Kathleen

Edwards and their now five-year-old daughter Kataleena Edwards. In her Second Amended Complaint, Plaintiff asserts the following claims against Nadeau, Jones and Robinson: (1) §1983 deliberate indifference to Gregory Edwards' serious medical needs in violation of the Fourteenth Amendment; (2) §1983 failure to intervene to stop another officer's unlawful conduct in violation of the Fourteenth Amendment; and (3) state medical malpractice. Plaintiff asserts the following claims against Armor: (1) §1983 pursuant to *Monell* for customs, policies or practices causing constitutional violations; (2) state medical malpractice; and (4) vicarious liability for the medical malpractice of its employees.

The medical defendants have moved for summary judgment on all claims except the state law claims, which they request be remanded. Triable issues of material fact exist on each of Plaintiff's claims. Accordingly, the Court should DENY the Motion in its entirety.

## II.     Statement of Material Facts as to Which Plaintiff Contends There Exists a Genuine Issue for Trial[1]

### A. Edwards behavior at the Walmart and duringTransportation to Jail

1.     WMPD Officer Kevin Krukoski was the arresting officer whose duty was to transport Edwards to jail and filing out whatever paperwork that needs to be done. *Depo Krukoski P. 10, L. 18 – 25.*

2.     Some of the paperwork is done while still on the scene because the jail will not accept the prisoner without it. *Depo Krukoski 11, L. 1 – 10.*

---

[1] In Plaintiff's argument she will reference the statement of material facts as "PCSF."

3.    The paperwork includes the Arrest Affidavit, Inventory of Belongings, an Arrest/Notice to Appear, Probable Cause Statement, and the Baker Act Form. *Depo Krukoski P. 11, L. 1 to P. 13, L. 22.*

4.    While Officer Krukoski was completing the paperwork in his patrol car, Mr. Edwards was restrained in the backseat muttering to himself. *Sworn Statement of Krukoski, P. 3, L.21 to P. 4, L.*

5.    Officer Krukoski used the computer aided dispatch system to directly forward the documents electronically to the jail. *Depo Krukoski P. 11, L. 15 – 21.*

6.    At the Walmart Officer Krukoski learned through Sergeant Michael Perez-through his interview of Kathleen Edwards- that Mr. Edwards was former military, suffers from post-traumatic stress disorder, and every year around the holidays he becomes manic.  Mrs. Edwards brought him with her to the Walmart because she was afraid he would harm himself if left alone. He was not taking his medication, had not slept for three to four days, and was acting paranoid.  He had an appointment scheduled the next day at the V.A.  *Depo Krukoski   P. 14, L. 23 to P. 15, L. 9.*

7.    A decision was made to Baker Act Mr. Edwards.  *Depo Krukoski P. 16, L. 2 – 8.*

8.    While in route to the jail, Mr. Edwards became agitated, screaming incoherently, yelling to let him out of the vehicle, and that he was being kidnapped.  He began to what sounded like to Officer Krukoski kicking the partition, kicking the door.  He was going in and out of agitation and being calm. *Depo Krukoski P. 18, L. 13 – 24 and Investigative Interview P. 3, L. 17 to P. 4, L. 15 and P. 7, L. 24 to P. 8, L. 18.*

9.    Officer Krukoski contacted Sergeant Perez through CAD (computer aided dispatch) mobile messaging and told him to advise the jail that Edwards was being combative in the back seat and to have jail staff waiting for his arrival. *Depo Krukoski P. 19, L. 22 to P. 20, L. 5.*

*10.*    By the time Officer Krukoski arrived at the jail with Mr. Edwards, the jail had received the paperwork regarding the Baker Act. *Depo Krukoski P. 21, L. 20 to P. 22, L. 7.*

### B.  Brevard County Jail Complex

11.     Sergeant Richard Zimmerman was the supervisor working the booking area on December 9, 2018. *Depo of Zimmerman, P. 9, L. 13 to P. 10, L. 3.*

12.     Knowing that Edwards had PTSD, was not taking his meds, and was being Baker Acted he was given a red jumpsuit indicating that he would be housed in the mental health unit. Nadeau could also observe that Edwards was wearing a red uniform.  The red uniform means that Edwards was a threat to harm somebody or himself.  In the jail they call that "the bubble" where Edwards would be on direct watch so that he can be seen and observed. *Depo of Nadeau, P. 12, L. 12 – 23;  Zimmerman, P. 17, L. 3 – 6 and P. 20, L. 7 – 12. Deposition of Wagner, P. 19, L. 11 – 15.*

13.     Instead of being given a medical and mental health evaluation, Mr. Edwards was placed in a holding cell where he waited for over thirty minutes. Nurse Debora Nadeau was told prior to Edward's arrival that he had PTSD and was not taking his medication. *Nadeau Statement to BCSO Investigator taken on 12/13/2018, P. 4, L. 8 – 24.*

14.     While in the holding cell, Edwards exhibited strange behavior. Nurse Debora Nadeau witnessed Edwards standing up at the window yelling and screaming and smacking his head on the window.  21.     She did not notify a deputy about what she witnessed because the deputies were right there and had visual on him at all times. *Nadeau Depo, P. 15, L. 2 – 5 and  P. 14, L. 17 – 23.*

15.     Deputy Robert Wagner could hear Edwards yelling in holding cell 7, not saying any words but just yelling. He was also banging on the glass which gave him concern. *Wagner Depo, P. 23, L. 6 to P. 24, L. 14.*

### C.  Use of Force

16.     From 1:52:00 until 2:00:50, it is an undisputed fact that the deputies at the BCJC used force to subdue Mr. Edwards.  There were numerous body strikes and maneuvers, stun gun deployment, oleoresin capsicum spray-also known as OC spray, handcuffs, an emergency restraint chair ('ECR"), and a spit mask. George Fayson ordered the use of the ECR. *Depo of George Fayson, P. 15, L. 7 to P. 18, L. 6.*

17.     Sergeant Zimmerman was responsible for supervising the placement of Edwards into the ECR. *Fayson Deposition, P. 19, L. 25  to P. 20, L. 5.*

18.     George Fayson made the decision to keep Edwards handcuffed behind his back when he was in the ECR.  *Id. at P. 21, L. 7-14.*

19.     BCSO Policy/Procedure 600.07K Restraint Chair Section D (1)(e) dictates that it is recommended when practical to restrain the inmate's arms in the front while in the ERC.   *BCSO Policy/Procedure 600.07K Restraint Chair Section D (1)(e).*

20.     Keeping Edwards' arms handcuffed behind his back was used temporarily until the officers were able to recover from the altercation, dealing with Edwards.  And to make sure Mr. Edwards was going to be in compliance, so there was for a short period of time and then he was going to be readjusted. *Depo of Fayson, P. 20, L. 20 to P. 23, L. 9.*

21.     His hands remained cuffed behind him for the entire time he was in the ECR in holding cell 9, so the deputies never readjusted his arms to be placed in the front of him.  *Jail Video of Edwards while in holding cell 9.*

22.     Once Edwards was in the ECR a spit mask was placed on him. Fayson did not object because that was the standard practice.  Edwards had a bit of saliva from his mouth, and Fayson had seen inmates spit and spatter.  *Fayson Depo, P. 24, L. 7-20.*

23.     During Ms. Nadeau's recorded statement to the BCSO's investigator taken two days after the incident, Nadeau states that she witnessed the take down, saw OC spray being used, saw the taser being used, saw him placed in the ECR, and the spit mask being put on him.  *Nadeau Sworn Statement to BCSO Investigator, P. 7, L. 10 – 24.*

24.     However, in her deposition she testified that she was not aware that Edwards had been OC sprayed, tased, was handcuffed behind his back, and that he still had the taser barbs in his back. *Nadeau Depo, P. 30, L. 20 to P. 31, L. 4.*

### D. **Post Use of Force**

25.     Edwards was wheeled into holding cell 9 at 2:07:36 without any nurse examining the restraints, evaluating him, taking vital signs or decontaminating him after the use of OC spray, and the taser barbs from the stun gun still in his back. *Jail video submitted to Court under seal.*

26.     Jail procedure dictates that once an inmate is restrained in the ECR, the taser barbs should be removed.  *Depo of Fayson, P. 34, L. 7 – 9.*

27.     BCSO Procedure dictates that when OC spray is used, the inmate is decontaminated in a timely manner.  *Fayson Depo, P. 24, L. 21 to P. 25, L. 3.*

28.     Armor Correctional Policy Number J-E-15 Post Use of Force/General also dictates an examination be conducted after use of force, in order to determine whether the patient has suffered any injury. The policy further states that a complete set of vital signs will be recorded for patients subjected to use of force application; this shall include PO2 for patients subjected to use of O.C. spray/tear gas.  Section 4 of the procedure contains a list of procedures to follow after O.C. spray is used, including flushing eyes and skin with copious amounts of cool water.  *Armor Correctional Policy J-E-15.*

29.     Decontamination is normally done in the shower or they can have the agent wiped from their faces.  *Zimmerman Depo, P. 27, L. 10 – 23.*

30.     If a shower is not possible then decontamination can be done with bottles of water, although that was not done with Edwards.  *Wagner Depo, P. 31, L. 3 to 7.*

31.     No decontamination procedures were used on Mr. Edwards until George Fayson testified that he used a towel in holding cell 9 to wipe Edward's face, but a review of the video refutes this.  Fayson was handed a towel at 2:23:58 when he first went into holding cell 9 after Edwards was unresponsive.  He never used the towel. Edwards was never decontaminated with water.  *Jail video submitted under seal; see also, Zimmerman Depo, P. 28, L. 19 to P. 29., L. 10 and P. 47, L. 16 - 20.*

32.     Fayson did not give any of his subordinates direction to decontaminate Edwards, even though he knew that was the process.  *Fayson Depo. P. 26, L. 5 – 12.*

33.     BCSO policy dictates that after each use of force, including the use of chemical agents, the inmate will be examined by a member of the medical staff and will provide treatment if necessary.  This was never done.  *Fayson Depo. P. 29, L. 6 – 18; Statement of Nadaeu, P. 7, L. 15 – 23; Wagner Depo, P. 32, L. 4 – 18; BCSO Policy/Procedure 600.07I (Response to Resistance) Use of Force Section C.*

34.     Armor Correctional also requires that a patient subjected to O.C. spray not be left unsupervised until it is obvious that they have recovered from the primary effects of the spray. *Armor Correctional Policy J-E-15 B. 4. L.*

35.     CSO *Policy/Procedure 600.07K Restraint Chair Section B states the following:*

> B.  Observations
>
> 1.  After the inmate has been placed in an ERC, a Deputy or Medical staff shall maintain **continuous observation during the first 30 minutes** to monitor the inmate and adjust the restraints as needed.  (*emphasis added*)

36.     It is important to observe the inmate after a use of force to ensure that he is not showing signs of distress.  *Zimmerman Depo, P. 37, L. 9 – 16.*

37.     About 7 minutes after being secured in the ECR, at 2:07:32 Edwards is wheeled into holding cell 9. There is no continuous observation noted on the videotape by any deputy or medical staff. All of the deputies clear out of the booking area by 2:11:00. At 2:15:52, FTO Wagner quickly peers into holding cell 9. FTO Robert Wagner sits at his desk at 2:16:43 but does not make observations of Mr. Edwards.  Since Mr. Edwards is still wearing a spit mask his facial expressions cannot be clearly seen. No one actually enters holding cell 9 until 2:23:18 at which time Edwards is unresponsive and having a medical emergency. *Jail Video.*

## E.  Permission to Evaluate Edwards

38.     The three Armor Correctional nurses testified that they cannot examine or medically evaluate an inmate unless a deputy gives permission first, even if the inmate is in medical distress.   *Ayana Robinson Depo, P. 21, L. 22 to P. 22, L. 11;  Yolanda Jones Depo, P. 14, L. 8 – 25.*

39.     Even though the combative situation had ended by about 2:00:01 and Edwards is now in the ECR with his legs and arms strapped down, handcuffed behind his back and wearing a spit hood Nadeau did not conduct a medical evaluation because he was still acting out and for safety reasons.  *Nadeau Depo, P. 18, L. 21 to P. 19, L.4.*

40.     After Edwards was placed in the ECR and was secure, no deputy requested that Nadeau perform a medical evaluation.  Nor did Nadeau request permission from a deputy to perform one. *Nadeau Depo, P. 24, L. 7 – 16.*

41.     At 2:16:04 Nurse Nadeau peers into holding cell 9 for five seconds. This is the first time Nurse Nadeau looks at Edwards, although she does not enter the cell to take vitals or perform a medical evaluation.  With regard to her peak in at 2:16:04, Nadeau testified to the following in her deposition beginning on page 33, L. 16:

Q.    Any particular reason why you could not have done a medical evaluation at that point?

A.   I could have but they won't let you until the inmate is no longer combative.

Q.   Again, he's barely moving.  He's tied up in a restraint chair, he has a spit mask on.  What was the threat?

A.  I'm sorry.  I – it's not up to me.  It's up to the officers.

Q.  But you could have asked an officer to do your job, correct?

A.  Yes I could have, but that's not what we do.

Q.  Do you – so you have to wait until an officer or deputy says, you can do your medical evaluation now; there's no threat anymore?

A.  Yes.

Q.  And no – deputy or officer ever told you that?

A.  No, sir.

**F.  Failure to call 911**

42.     At 2:23:19 Fayson and Wagner enter holding cell 9 and find Edwards unconscious and unresponsive.  Wagner performs a sternum rub to no avail. Nurse Debora Nadeau stands in the doorway but does not enter.  Zimmerman enters the cell a short time after.  *Jail Video.*

43.     At 2:26:25 is the first time Nadeau goes into holding cell 9 to evaluate Edwards.  *Depo Nadeau, P. 39, L. 2 – 4.*

44.     When Nadeau went in, Edwards was lethargic and nonresponsive and did not respond to verbal commands or a sternum rub. *Nadeau Sworn Statement 12/13/2018, P. 14, L. 13-17.*

45.     Edwards was unconscious and had shallow breaths when Nadeau examined him. *Nadeau Depo, P. 38, L. 24 to P. 39, L. 15.*

46.     A sternum rub is used to help alert someone who is unconscious. *Depo of Nedeau, P. 36, L. 24 to P. 37, L.4.*

47.     According to Nadeau, she was not authorized to call 911. Only a lieutenant can authorize a call to 911. Even the charge nurse can only suggest 911 but she can't authorize it. *Nadeau Depo, P. 37, L. 19 – 22 and P. 40, L. 19 to P. 41, L. 7.*

48.     Ashley Fried Taylor is a registered nurse and was an Armor Correctional employee who was assigned as the charge nurse in the medical until on the day of the incident with Edwards. *Ashley Fried Taylor Statement to BCSO Investigator taken day of the incident, P. 3, L. 4 to P. 4, L. 5.*

49.     Fried Taylor called Nadeau when she heard the "all available officers to booking area" call. Nadeau told her that an inmate had come in and he was combative and that he took down one of the officers. *Id. at P. 4, L. 10 – 20.*

50.     Approximately a half-hour later there was another call that a stretcher was needed in booking. Fried Taylor ordered the two nurses (Jones and Robinson) to go down with the stretcher. At the time she didn't know it was for the same inmate that Nadeau had told her about. *Id. at P. 4, L. 22 – P. 5., L. 8.*

51.     When nurse Yolanda Jones arrived in the booking area with the stretcher, she noticed Edwards was in the ECR with a rebreather mask, "like they were giving him oxygen." *Yolanda Jones Statement to BCSO Investigator taken day of the incident, P. 6, L. 9 – 13.*

52.     Jones could see that Edwards did not look so good. He looked unresponsive and she did not see any condensation on the rebreather mask. He was taking very shallow breaths. If a person is breathing with a rebreather mask and pushing out CO2 forcefully you expect to see condensation on the inside of the mask. Jones thought maybe they did not have the rebreather on right. *Id. at P. 6 to P. 8, L. 23.*

53.    When Edwards comes through the medical door, he is not on a stretcher, he is still in the ECR.  *Id. at P. 5, L. 10 – 14.*

54.    Edwards was completely unresponsive and his breathing was almost nonexistent. *Id. at P. 5, L. 16 – 18.*

55.    Fried Taylor said "I need a sergeant down here know immediately." Sergeant Zimmerman was already down there.  She didn't see him because he was on the other side of the wall.  Zimmerman said "I am a sergeant, I'm already here."  Fried Taylor then told him, "I need you to initiate 911." *Id. at P. 6, L. 7 – 13.*

56.    Nadeau failed to communicate the Fried Taylor the entirety of her knowledge regarding what had transpired with Edwards between the time he arrived at the facility and then arrived in the medical unit.  This failure delayed Edwards' ability to receive timely emergency medical care directly causing Edwards' medical condition to needlessly deteriorate.  *Fried Taylor Sworn Declaration dated May 24, 2021 at paragraph 7.*

57.    Nadeau, Jones and Robinson reported that they observed Edwards in the restraint chair, unresponsive, with an oxygen mask on his face, with shallow breathing.  Instead of insisting that 911 be initiated immediately to have Edwards transferred to a hospital for necessary emergency medical care, Nadeau, Jones and Robinson, permitted security officers to transport Edwards, unresponsive and still restrained in the restraint chair, with oxygen, to the medical unit for further evaluation by the charge nurse.  Due to the security doors in place on the path to the medical unit, it would take an estimated three to five minutes for Edwards to be transferred from Booking to the Medical Unit. These failures delayed Edwards' ability to receive timely emergency medical care directly causing his medical condition to needlessly deteriorate. *Fried Taylor Sworn Declaration dated May 24, 2021 at paragraph 6.*

## G. <u>Cause of Death</u>

58.    The Brevard County Medical Examiner, Sajid Qaiser, M.D. found the cause of death to be excited delirium and complications due to hyperactive and violent state with subsequent restraint.  *Qaiser Depo, P. 18, L. 5 – 11.*

59.    Dr. Qaiser does not attribute Edwards' alleged huffing of Endust to the cause of death.  *Id. at P. 2 – 19.*

60.     A toxicology screening did not detect any drugs except for a small amount of Benadryl; therefore, no drugs contributed to the death of Edwards including inhalants. *Id. at P. 33, L. 6 – 25.*

61.     Defendant Ivey, Wagner, Zimmerman and Fayson's own forensic pathologist does not contribute Edwards alleged huffing to his death. *Depo of Vernard Adams, P. 21, L. 16 – 18.* Lastly, Plaintiff's forensic pathologist, Daniel Schultz, M.D. also does not think the alleged huffing of inhalants contributed to Edwards' death. *Schultz Depo, P. 38, L. 4 – 19.*

62.     Dr. Schultz opined that Edwards died from Rhabdomyolysis when he was restrained in the ECR. Rhabdomyolysis is caused by the release of a chemical into the bloodstream called creatine kinase when muscles are compressed or injured. *Schultz Depo, P. 13, L. 24 to P. 14, L. 23.*

63.     The damage happens as a consequence of pressure and time. *Id. ay P. 48, L. 4 – 22.*

64.     Dr. Adams opinion is that Edwards died from excited delirium. He explains excited delirium to be an elevation in the sympathetic tone. One of the autonomic nervous systems is called the sympathetic. The sympathetic has to do with fight or flight. The are two ways to increase the sympathetic tone. One is by the adrenal medulla. The inner part of the adrenal gland, which can dump adrenaline that is epinephrine into the blood stream. *Adams Depo. P. 13, L. 16 to P. 14, L. 12.*

65.     The physical restraint by others and the fear and pain from being restrained in the chair, pepper sprayed, handcuffed, and tasered, all increased Edwards' sympathetic tone. This all contributed to his ultimate demise. *Id. at P. 15, L. 1 to P. 16, L. 4.*

## II.     <u>Argument</u>

### A. <u>Plaintiff's Civil Rights Claims</u>

Plaintiff's civil rights claims are brought pursuant to 42 U.S.C. § 1983. There are two components to any § 1983 action: first, a showing that the injury was inflicted "under color of state law" and second, a showing that the injury

involved a deprivation of "rights, privileges, or immunities secured by the Constitution and laws of the United States." *See, e.g., Nelson v. Prison Health Servs., Inc.,* 991 F.Supp. 1452, 1460 (M.D. Fla. 1997). The law is settled that the Armor and the individual nurses, who have contracted to provide medical services at the Jail, are state actors and, therefore, "persons" under § 1983. *See, e.g., id; see also Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir. 1985). The second inquiry is whether there is sufficient evidence to create a triable issue of fact as to whether the Defendants' deprived Edwards of a constitutional right. When all facts are interpreted and inferences are drawn in Plaintiff's favor, a rational jury could conclude that the Armor and the individual nurses deprived Edwards of his constitutional right to adequate medical care.

i. **Defendant Debora Nadeau Was Deliberately Indifferent To Gregory Edwards' Serious Mental Health Needs Upon his Arrival at the Jail.**

Nadeau's failure to provide even the most rudimentary screening, assessment, treatment or care when Gregory Edwards arrived at the jail demonstrates deliberate indifference to his serious medical needs in contravention of the Fourteenth Amendment. In *Estelle v. Gamble*, the Supreme Court held that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976) (quotation

marks and citations omitted). Under the Fourteenth Amendment, pre-trial detainees' rights to medical care are "at least as great" as those of convicted inmates. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244 (1983). "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and subjective inquiry. First, the plaintiff must prove an objectively serious medical need. Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (citations omitted). Whether an official had the requisite knowledge of a substantial risk is a question of fact and may be proved in the usual manner, including inferences from circumstantial evidence. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation omitted).

By the time Edwards arrived at the jail, jail officials had received the paperwork regarding the Baker Act. *PCSF 10.* Knowing that Edwards had PTSD, was not taking his meds, and was being Baker Acted he was given a red jumpsuit indicating that he would be housed in the mental health unit. *PCSF 12.*

Instead of being given a medical and mental health evaluation, Mr. Edwards was placed in a holding cell where he waited for over thirty minutes. *PCSF 13.* Plaintiff disputes the facts alleged in her Motion beginning at the bottom of page 5. Her sworn statement given to the BCSO investigator just four days after the incident completely contradicts her deposition testimony. Nadeau

was told prior to Edward's arrival that he had PTSD and was not taking his medication. *PCSF 13.* While in the holding cell, Edwards exhibited strange behavior. Nadeau witnessed Edwards standing up at the window yelling and screaming and smacking his head on the window. *PCSF 14.* Nadeau could also observe that Edwards was wearing a red uniform. The red uniform means that Edwards was a threat to harm somebody or himself. In the jail they call that "the bubble" where Edwards would be on direct watch so that he can be seen and observed. *PCFS 12.*

Gregory Edwards was suffering from a serious mental health condition when he arrived and while he was detained in the Jail. "A serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citation omitted). "In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Brown v. Johnson*, 387 F.3d at 1351 (quotation omitted). To be serious, however, the medical condition need not present a life-threatening circumstance. *See, e.g., Farrow*, 320 F.3d at 1245. The term "serious medical need" embraces psychological requirements: "Failure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of prisoners." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation

omitted); *see also Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990).

Edwards' behavior before and after his arrival at the jail-which was known to Nadeau-demonstrated obvious signs and symptoms of mental illness, including agitation, anxiety and paranoia. By failing to address Edwards' mental health needs, his psychological condition deteriorated to the point that it ultimately caused the confrontation with the correction deputies requiring the use of force. Like what happened to Edwards, a serious medical need may be found when the need is worsened by delay in treatment. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

### ii. **Defendants Debora Nadeau, Yolanda Jones, and Ayana Robinson Were Deliberately Indifferent to Edwards' Serious Medical Needs After the Use of Force**.

The three individual nurse Defendants, individually and collectively, exhibited a deliberate and callous indifference to Gregory Edwards' serious medical needs after the use of force. A prison official is deliberately indifferent when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Further, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a

prison official knew of a substantial risk from the very fact that the risk was obvious." *McElligott*, 182 F.3d at 1255 (citation omitted).

The Eleventh Circuit has provided guidance on the distinction between negligence and deliberate indifference. For instance, "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997). Alternatively, even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d. at 1255. Moreover, when the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference. *McElligott*, 182 F.3d at 1255.

In response to Edwards' serious medical needs which were outwardly apparent and obvious, each of the individual nurses offered such cursory assistance as to amount to no treatment at all while knowing that such indifference posed a substantial risk of harm. Each of the individual nurse defendants were obligated to provide Edwards with constitutionally acceptable medical care. Nadeau witnessed the take down, saw OC spray being used,

saw the taser being used, saw him placed in the ECR, and the spit mask being put on him.  *PCSF 23.*

Edwards was wheeled into holding cell 9 at 2:07:36 without any nurse examining the restraints, evaluating him, taking vital signs or decontaminating him after the use of OC spray, and the taser barbs from the stun gun still in his back. *PCSF 25.*   The Eleventh Circuit in *Danly v. Allen,* 540 F.3d 1298, 1313 (11th Cir. 2008) stated that after a detainee is sprayed with pepper spray and was no longer a disruption or threat, a jailer's refusal to permit proper decontamination violated a clearly established right because existent "general legal principles" were enough to clearly establish the right.

BCSO Procedure dictates that when OC spray is used, the inmate is decontaminated in a timely manner.  *PCSF 26.*  Similarly, Armor Correctional Policy Number J-E-15 Post Use of Force/General also dictates an examination be conducted after use of force, in order to determine whether the patient has suffered any injury, either directly from the use of force, or indirectly, such as by falling after incapacitation. The policy further states that a complete set of vital signs will be recorded for patients subjected to use of force application; this shall include PO2 for patients subjected to use of O.C. spray/tear gas.  Section 4 of the procedure contains a list of procedures to follow after O.C. spray is used, including flushing eyes and skin with copious amounts of cool water.  *PCSF 28.*

Decontamination is normally done in the shower or they can have the agent wiped from their faces. *PCFS 29.* If a shower is not possible then decontamination can be done with bottles of water, although that was not done with Edwards. *PCFS 30.* No decontamination procedures were used on Mr. Edwards until George Fayson testified that he used a towel in holding cell 9 to wipe Edward's face, but a review of the video refutes this. *PCFS 31.* Fayson was handed a towel at 2:23:58 when he first went into holding cell 9 after Edwards was unresponsive. He never used the towel. Edwards was never decontaminated with water. *Id.* Fayson did not give any of his subordinates direction to decontaminate Edwards, even though he knew that was the process. *PCFS 32.*

BCSO policy dictates that after each use of force, including the use of chemical agents, the inmate will be examined by a member of the medical staff and will provide treatment if necessary. This was never done. *PCFS 33.* Armor Correctional also requires that a patient subjected to O.C. spray not be left unsupervised until it is obvious that they have recovered from the primary effects of the spray. *PCFS 34.*

CSO *Policy/Procedure 600.07K Restraint Chair Section B states the following:*

> B. Observations
> 1. After the inmate has been placed in an ERC, a Deputy or Medical staff shall maintain **continuous observation during the first 30 minutes** to monitor the inmate and adjust the restraints as needed. (*emphasis added*)

*PCFS 35 .*

It is important to observe the inmate after a use of force to ensure that he is not showing signs of distress. *PCFS 36.* About 7 minutes after being secured in the ECR, at 2:07:32 Edwards is wheeled into holding cell 9. There is no continuous observation noted on the videotape by either any deputy or medical staff. All of the deputies clear out of the booking area by 2:11:00. At 2:15:52, FTO Wagner quickly peers into holding cell 9. FTO Robert Wagner sits at his desk at 2:16:43 but does not make observations of Mr. Edwards. Since Mr. Edwards is still wearing a spit mask his facial expressions cannot be clearly seen. No one actually enters holding cell 9 until 2:23:18 at which time Edwards is unresponsive and having a medical emergency. *PCFS 37.*

The three defendant nurses testified that they cannot examine or medically evaluate an inmate unless a deputy gives permission first, even if the inmate is in medical distress. *PCFS 38.* This practice of the Armor nurses contributed to the deliberate indifference by causing an unconstitutional delay in treatment. *See McElligot 182 F.3d at 1255.*

After Edwards was placed in the ECR and was secure, no deputy requested that Nadeau perform a medical evaluation. Nor did Nadeau request permission from a deputy to perform one. *PCFS 40.* Even though the combative situation had ended by about 2:00:01 and Edwards is now in the ECR with his legs and arms strapped down, handcuffed behind his back and wearing a spit

hood, Nadeau did not conduct a medical evaluation because he was still acting out and for safety reasons. *PCFS 39.* As seen on the jail video, Nadeau's excuse for not evaluating Edwards is incredulous. Edwards should have been evaluated at this point and by not doing so, Nadeau acted with deliberate indifference to Edwards' serious medical needs.

Plaintiff urges the Court to review the videotape of Nadeau's deposition. During the deposition questions were asked of her while showing a side-by-side view of Edwards in holding cell 9 and Nadeau in her office. Pursuant to Section (C)(2) of the Administrative Procedures for Electronic Filing, Middle District of Florida (November 7, 2022), the hyperlink to Nadeau's video deposition is:

https://www.dropbox.com/s/fun4mhkqnrvj3jo/Nadeau_D-091522-1of1.mpg?dl=0

At 2:16:04 Nurse Nadeau peers into holding cell 9 for five seconds. This is the first time Nurse Nadeau looks at Edwards, although she does not enter the cell to take vitals or perform a medical evaluation. With regard to her peak in at 2:16:04, Nadeau testified to the following in her deposition beginning on page 33, L. 16:

Q. Any particular reason why you could not have done a medical evaluation at that point?

A. I could have but they won't let you until the inmate is no longer combative.

Q.  Again, he's barely moving.  He's tied up in a restraint chair, he has a spit mask on.  What was the threat?

A.  I'm sorry.  I – it's not up to me.  It's up to the officers.

Q.  But you could have asked an officer to do your job, correct?

A.  Yes I could have, but that's not what we do.

Q.  Do you – so you have to wait until an officer or deputy says, you can do your medical evaluation now; there's no threat anymore?

A.  Yes.

Q.  And no – deputy or officer ever told you that?

A.  No, sir.

*PCFS 41.*

At 2:23:19 Fayson and Wagner enter holding cell 9 and find Edwards unconscious and unresponsive.  Wagner performs a sternum rub to no avail. Despite the urgency of the situation, Nadeau stands in the doorway but does not enter.  *PCSF 42.*  Zimmerman enters the cell a short time after.  *Id.*

At 2:26:25 is the first time Nadeau goes into holding cell 9 to evaluate Edwards.  *PCFS 43.*  When Nadeau went in, Edwards was lethargic and nonresponsive and did not respond to verbal commands or a sternum rub.  *PCSF 44.*  Edwards was unconscious and had shallow breaths when Nadeau examined him.  *PCFS 45.* A sternum rub is used to help alert someone who is unconscious. *PCSF 46.*

When nurse Yolanda Jones arrived in the booking area with the stretcher, she noticed Edwards was in the ECR with a rebreather mask, "like they were giving him oxygen." *PCSF 51.* Jones could see that Edwards did not look so good. He looked unresponsive and she did not see any condensation on the rebreather mask. He was taking very shallow breaths. If a person is breathing with a rebreather mask and pushing out $CO_2$ forcefully you expect to see condensation on the inside of the mask. Jones thought maybe they did not have the rebreather on right. *PCSF 52.* Jones did not say or do anything in response to her observations.

According to Nadeau, she was not authorized to call 911. Only a lieutenant can authorize a call to 911. Even the charge nurse can only suggest 911 but she can't authorize it. *PCSF 47.* Ashley Fried Taylor is a registered nurse and was an Armor Correctional employee who was assigned as the charge nurse in the medical until on the day of the incident with Edwards. *PCSF 48.*

Fried Taylor called Nadeau when she heard the first "all available officers to booking area" call. Nadeau told her that an inmate had come in and he was combative and that he took down one of the officers. *PCSF 49.* Approximately a half-hour later there was another call that a stretcher was needed in booking. Fried Taylor ordered the two nurses (Jones and Robinson) to go down with the stretcher. At the time she didn't know it was for the same inmate that Nadeau had told her about earlier. *PCSF 50.*

When Edwards comes through the medical door, he is not on a stretcher, he is still in the ECR. *PCSF 61*   Edwards was completely unresponsive and his breathing was almost nonexistent. *PCSF 54.*   Fried Taylor immediately told Sergeant Richard Zimmerman to initiate 911." *PCSF 55.*

Nadeau failed to communicate to Fried Taylor the entirety of her knowledge regarding what had transpired with Edwards between the time he arrived at the facility and then arrived in the medical unit.  This failure delayed Edwards' ability to receive timely emergency medical care directly causing Edwards' medical condition to needlessly deteriorate.  *PCSF 56.* Nadeau, Jones and Robinson each reported that they observed Edwards in the restraint chair, unresponsive, with an oxygen mask on his face, with shallow breathing.  Instead of insisting that 911 be initiated immediately to have Edwards transferred to a hospital for necessary emergency medical care, Nadeau, Jones and Robinson, permitted security officers to transport Edwards, unresponsive and still restrained in the restraint chair to the medical unit for further evaluation by the charge nurse.  Due to the security doors in place on the path to the medical unit, it would take an estimated three to five minutes for Edwards to be transferred from Booking to the Medical Unit.  These failures delayed Edwards' ability to receive timely emergency medical care directly causing his medical condition to needlessly deteriorate. *PCSF 57.*

The deliberate indifference of each of the individual nurse defendants, caused needless delays in providing emergency medical assistance to Edwards. Edwards' medical condition continued to deteriorate until it was too late to save him.

### iii.    Duty to Intervene

Plaintiff concedes that Defendants Jones and Robinson did not have a reasonable opportunity to intervene.  However, there is sufficient evidence that Defendant Nadeau should have intervened.  Nadeau had an obligation to advocate for her patient's safety. Despite this obligation, there is no Armor policy in place that would authorize its medical staff to intervene with the actions of corrections officers to advocate for their patients, even when patient safety was at issue. To the contrary, the practice of Armor was to not intervene.

Defendant argues that Nadeau did not observe the use of force so she had no duty to intervene.  As stated earlier, Nadeau witnessed all of the use of force. Despite this she failed to advocate for decontamination of the OC spray, failed to advocate for the removal of the taser barbs, failed to advocate to check the restraints on the ERC, and failed to advocate for the medical evaluation and observation of Edwards after the use of force ended.

### iv.    Armor's Liability For Policies, Practices and Customs.

Armor's customs, policies and practices were grossly inadequate in several relevant respects and were the moving force behind the deprivation of

Gregory Edwards' constitutional rights. Specifically, Armor's policy and practice of not rendering medical care to an inmate until a deputy authorizes it creates an unconstitutional delay in medical care. Likewise, Armor's policy and practice of not permitting its medical staff employees to initiate 911 also deprived Edwards of his constitutional right to medical care.

In *Monell v. Department of Social Services of New York*, the Supreme Court held that "municipalities and other local government units" are "included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978).[3] As interpreted by the Eleventh Circuit, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the custom or policy caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citation omitted). A rational trier of fact could determine each element in Plaintiff's favor.

As explained *supra*, Edwards was deprived of his Fourteenth Amendment right to adequate medical assessment, treatment and care for his serious medical needs. Armor concedes that it may be held liable under the principles of *Monell*, as it extends to private companies. Armor had policies, customs, and practices that constituted deliberate indifference to Edwards' constitutional right.

There are triable issues of fact regarding Armor's liability for maintaining policies, practices and customs. Each policy, custom or practice prevented Edwards from receiving the medical care he is guaranteed by the Constitution. A reasonable juror could well find that the policies and customs described above caused the violations of his constitutional rights.

## III.   CONCLUSION

Based on all of the foregoing, Armor Correctional and the individual nurse defendants' Motion for Summary Judgment must be DENIED in its entirety.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of November 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties via transmission of Notices of Electronic Filing generated by CM/ECF or in some other manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ David Chonin*
David Chonin (FBN: 066664)
david@lawbreiter.com
LAW OFFICES OF BRIAN BREITER
5775 Blue Lagoon Drive, Suite 300
Miami, FL 33126
Telephone:  (866) 954-9955
Facsimile:   (855) 776-6747
Attorneys for Plaintiff
