# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MARGARITA RODRIGUEZ-
BONILLA,

           Plaintiff,

v.

WAYNE IVEY, KELLY HAMAN,
GEORGE FAYSON, RICHARD
ZIMMERMAN, ROBERT
WAGNER, JR., FREDDY
CEDENO, ALLISON
BLAZEWICZ, DEBORA
NADEAU, AYANA ROBINSON,
YOLANDA JONES and ARMOR
CORRECTIONAL HEALTH
SERVICES INC.,

           Defendants.

Case No. 6:21-cv-428-JA-DAB

---

## ORDER

Gregory Lloyd Edwards tragically died on December 10, 2018, following a short stint at the Brevard County Jail Complex. Two years later, Margarita Rodriguez-Bonilla, as personal representative of Edwards's estate, commenced this action in state court against various individuals and entities affiliated with the jail. (Doc. 1-3). Defendants timely removed the case, (Doc. 1), and it was

eventually transferred to this Court, (Doc. 12).[1] On October 5, 2021, the Court dismissed Count I insofar as it was brought against Defendants Debora Nadeau, Ayana Robinson, and Yolanda Jones, but otherwise allowed the case to proceed. (Doc. 72).

With discovery complete, Defendants have now filed two separate motions for summary judgment—one on behalf of Defendants Nadeau, Robinson, Jones (the Nurse Defendants), and Armor Correctional Health Services, LLC (collectively, the Armor Defendants) (Doc. 129), and a second on behalf of Defendants Robert Wagner, Jr., Richard Zimmerman, George Fayson (the Deputy Defendants), and Sheriff Wayne Ivey (collectively, the Sheriff's Office Defendants) (Doc. 131).[2] Rodriguez-Bonilla has responded to both motions (Docs. 159 & 160), and the Sheriff's Office Defendants have filed a Reply (Doc. 170). While the Court expresses sympathy for Edwards and his family—and concern regarding some of the Defendants' actions—both motions are due to be granted for the reasons set forth below.

---

[1] Rodriguez-Bonilla originally filed this case in state court in Miami-Dade County. Defendants removed the case to the United States District Court for the Southern District of Florida before the parties agreed to transfer it here to the Middle District.

[2] In August 2022, the parties jointly stipulated to the dismissal of all claims against three other Sheriff's Office Defendants: Freddy Cedeno (Doc. 113), Allison Blazewicz (Doc. 117), and Kelly Haman (Doc. 118).

# I. BACKGROUND

## 1. <u>Edwards's Arrest</u>

The circumstances giving rise to this case began on the morning of December 9, 2018, when Edwards was arrested for attacking a Christmas toy-drive volunteer outside the Walmart store in West Melbourne, Florida.[3] At approximately 11 a.m., Edwards and his wife Kathleen arrived at the store in search of sleep medication. (Kathleen Edwards Dep., Doc. 147, at 52). Kathleen later testified that Edwards—an Army combat veteran with a history of post-traumatic stress disorder (PTSD)—had not slept in four days, and she did not want to leave him at home by himself because "he was psychotic" and she worried that "he was a danger to himself and other[s]." (*Id.* at 52, 57).

When they arrived at Walmart, Kathleen entered the store, believing Edwards was in tow. (*Id.* at 59). In fact, however, Edwards had peeled off from his wife to investigate a box truck parked outside, which was being used to collect toys for a Christmas charity drive. (Perez Body Cam Video at 10:55–11:30).[4] According to witnesses, Edwards climbed into the back of the truck,

---

[3] Rodriguez-Bonilla sued the officers who arrested Edwards in a related but separate case, *Rodriguez-Bonilla v. City of West Melbourne*, No. 6:20-cv-2235-JA-DAB, which was consolidated with the current suit for the purposes of discovery and mediation. (Doc. 42). The Court has since disposed of all claims in that case. (*See* Docs. 94, 105, and 110 in Case No. 6:20-cv-2235).

[4] Defendants have filed multiple flash drives containing video footage of Edwards's arrest and his time at the jail. Some of this footage remains under seal. (*See* Doc. 128).

removed his sandals, began laughing to himself, and fell backwards into a pile of toys. (*Id.*). After being asked to leave the truck, Edwards became agitated and attacked one of the volunteers, repeatedly punching, scratching, and kicking him before a second volunteer was able to tackle Edwards and pin him to the ground. (*Id.* at 10:20–10:35).

Bystanders quickly flagged down Jacob Mathis, an officer with the West Melbourne Police Department who was patrolling nearby. (Mathis Dep., Doc. 150, at 10). After arriving to the scene and learning about the attack, Officer Mathis attempted to handcuff Edwards, who resisted. (Mathis Body Cam Video at 00:30–01:44). During the ensuing struggle, Officer Mathis pleaded with Edwards to relax and asked him why he was fighting, to which Kathleen—who had since exited the store and joined the crowd of onlookers surrounding her husband—replied that Edwards had PTSD and was "having a psychotic episode." (*Id.* at 01:44–02:00).

Officer Mathis was eventually able to restrain Edwards with the help of Officer Kevin Krukoski and Sergeant Michael Perez, fellow members of the West Melbourne Police Department who had responded to the scene. (*Id.* at 06:00–08:20). In addition to applying handcuffs, the officers shackled Edwards's ankles and placed a "hobble" around his knees to prevent him from kicking. (Krukoski Dep., Doc. 149, at 10). They then lifted him to his feet and placed him in the back of Officer Krukoski's patrol car. (*Id.*). All told, Edwards's

4

struggle with the officers lasted close to eight minutes, with Edwards oscillating between active resistance and seeming compliance throughout. (Mathis Body Cam Video at 00:40–08:00).

Once the officers were able to restrain Edwards, Sergeant Perez interviewed Kathleen, who reiterated that Edwards was a military veteran who suffered from PTSD and was going through a "psychotic episode," as he tended to do around Christmas time. (Perez Body Cam Video at 02:20–02:30). According to Kathleen, Edwards had been exhibiting strange and "paranoid" behavior over the past few days, including pacing around the house at odd hours, opening and closing doors, and waking up their young daughter in the middle of the night, seemingly without reason. (*Id.* at 03:40–04:10). Kathleen explained that despite Edwards's erratic behavior—or because of it—she chose not to leave him at the house because she feared that he might commit suicide, something he had threatened to do in the past. (*Id.* at 04:15–04:25). She also disclosed that Edwards was on probation for attacking hospital workers when he was "Baker Acted"[5] for a previous psychotic episode the year before. (*Id.* at 05:00–05:18).

---

[5] The Baker Act, Fla. Stat. § 394.451 *et seq.*, "allows an authorized person, such as a police officer, to initiate an involuntary examination of an individual whom the officer believes may have a mental illness, is substantially likely to cause serious bodily harm to himself or others, and refuses a voluntary examination or is unable to understand the need for an examination." *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1133 n.1 (11th Cir. 2018).

After speaking with Kathleen, Sergeant Perez interviewed other witnesses, including the victim of the attack, who confirmed that he would like to "press charges." (*Id.* at 09:45–10:36). Edwards was eventually arrested for battering the toy-drive volunteer, resisting officers with violence, and violating the terms of his probation. (Police Report, Doc. 149-1, at 1). Due to Edwards's manic behavior and the mental health history provided by Kathleen, the officers decided that Edwards should be involuntarily committed for a psychological evaluation pursuant to the Baker Act. (Perez Dep. at 16). But because Edwards was also being arrested for suspected felonies, the officers determined that, in accordance with police department policy, he should first be taken to the jail to be processed and given a court date rather than taken directly to a mental health facility. (Krukoski Dep. at 16–17; Perez Dep. at 17–19).

By the time he was placed in the back of Officer Krukoski's patrol car, Edwards had largely calmed down. Footage from the backseat camera shows that Edwards sat there quietly, clearly winded, and occasionally mumbled or laughed to himself while the officers interviewed witnesses outside. (Rear Patrol Car Video 1 at 08:30–18:00). At one point, Officer Mathis and another officer opened the doors of the cruiser and checked Edwards for any visible injuries. That process elicited no aggression from Edwards, even when Officer Mathis crawled into the backseat to examine specks of blood behind Edwards's ear.

(Rear Patrol Car Video 2 at 36:58–38:00). Mathis asked Edwards if he would like to be checked again by medical staff on scene, but he did not respond.

As time went on, Edwards continued to appear calm and cogent—if somewhat frustrated by his prolonged confinement in the patrol car. He complained, for example, that Officer Krukoski was taking too long to complete his arrest report and expressed that he was eager to get moving because he was "not comfortable" in the back seat. (*Id.* at 44:00–43:30). Later, Edwards asked Officer Krukoski: "What am I locked up for? What's the charges?" When Officer Krukoski responded that Edwards was being charged with battery and resisting arrest, Edwards initially denied hitting anyone before admitting, "oh, I did punch him" and chuckling to himself. (*Id.* at 26:45–27:00). After nearly thirty-five minutes in the patrol car, Edwards briefly became agitated, pleading with Officer Krukoski to remove his handcuffs. When Officer Krukoski refused, however, Edwards dropped the issue and calmed down. (*Id.* at 28:00–29:00). Later, Edwards made small talk with Officer Krukoski on topics such as their shared military service and Officer Krukoski's pay as a police officer. (*Id.* at 51:20–52:30; 54:40–55:20).

Edwards largely maintained this calm demeanor during the half-hour drive to the Brevard County jail, with a few minor outbursts. (*Id.* at 56:20–1:29:00). About fifteen minutes into the trip, for example, Edwards complained that he could not feel his hands and asked Officer Krukoski to pull over so that

7

he could use the bathroom and remove his handcuffs—a request that went unfulfilled. (*Id.* at 1:10:10–1:12:30). A few minutes later, apparently realizing that he was not being taken to an outpatient clinic, Edwards became agitated, repeatedly yelling at Officer Krukoski to "take the next exit," stomping his feet on the floor, and accusing Officer Krukoski of kidnapping him. (*Id.* at 1:13:30–1:15:00). Officer Krukoski later testified that, in response to this behavior, he contacted Sergeant Perez and had him relay to the jail staff that Edwards was being "combative in the back seat" and that he may need assistance when the duo arrived.   (Krukoski Dep. at 19–20). Within a few minutes, however, Edwards had again calmed down, spending the remainder of the trip in silence. (Rear Patrol Car Video 2 at 1:18:00–1:29:00). By the time Edwards was taken into the jail, he appeared to be relaxed and fully compliant. (*Id.* at 1:29:00–1:31:00).

## 2. **Edwards's Time in the Jail**

Officer Krukoski and Edwards arrived at the jail just after 1 p.m. (Vehicle Sally Port Video at 01:09:28). They were met in the vehicle sally port by Deputy Wagner and Sergeant Zimmerman of the Brevard County Sheriff's Office, who took custody of Edwards, patted him down, and accompanied him into the jail to await processing. (*Id.* at 01:09:47–01:12:09; Inner Sally Port Video at 01:12:10–01:14:48). Testifying later, neither deputy remembered being told that Edwards was being committed under the Baker Act. (Zimmerman Dep., Doc.

137, at 11; Wagner Dep., Doc. 138, at 15). But Officer Krukoski testified that he "would have handed them the Baker Act form" along with the other arrest paperwork when they took custody of Edwards. (Krukoski Dep. at 21–22; *see also* Police Report, Doc. 149-1, at 12). And upon his arrival Edwards was put in a red jumpsuit, indicating that he would be housed in the mental health unit of the jail. (Zimmerman Dep. at 20; Wagner Dep. at 19).

According to Deputy Wagner, jail policy dictated that an inmate brought in under the Baker Act should be given a mental evaluation "as soon as reasonably possible," on a "first come, first serve" basis. (Wagner Dep. at 22). "Normally," Sergeant Zimmerman explained, an arrestee "gets processed in, he gets pictures taken, fingerprints, and he's seen by the nurse after that, depending on . . . [the nurse's] workload at the time, if there's people in front of [him]." (Zimmerman Dep. at 19). On the day Edwards was brought in, the jail was "quite busy," (Wagner Dep. at 25), and although Edwards appeared calm and compliant, the deputies decided to place him alone in Holding Cell 7 to "cool down" while he waited to be processed. (Zimmerman Dep. at 23).[6]

Video footage shows that Edwards entered Holding Cell 7 just after 1:19 p.m. and remained there for the next thirty minutes. (Holding Cell 7 Video at

---

[6] It is unclear from the deposition testimony whether Edwards's earlier combative behavior led the deputies to delay his processing time or to simply place him in a different cell while he waited for his turn.

01:19:46–01:51:30). His time in the cell was unremarkable. During the first fifteen minutes, Edwards sat down, picked at his jail-issued lunch, and briefly engaged in calisthenics, including push-ups and tricep dips. (*Id.* at 01:19:47–01:41:46). At 1:41 p.m., jail personnel walked by the cell, and Edwards knocked gently on the glass to get their attention. (*Id.* at 01:41:37–01:42:00). Ignored, he returned to his lunch and began pacing around. (*Id.* at 01:42:00–01:47:34). Six minutes later, jail personnel walked by again, and Edwards tried once more to flag them down, knocking harder this time. (*Id.* at 01:47:35–01:47:55). When that did not work, Edwards became frustrated, angerly slapping the wall of his cell and then returning to the window to pound it intermittently with his fists. (*Id.* at 01:47:56–01:51:00).

Finally, at 1:51 p.m., a deputy appeared, opened the cell door, and attempted to direct Edwards to the booking area, where he would have been photographed, fingerprinted, and examined by a nurse. (*Id.*, 01:51:30–01:51:45; Wagner Dep. at 25). Video footage from outside the cell shows Edwards complying at first, before turning and walking in the wrong direction. (Receiving 2 Video at 01:51:46–01:51:52). The deputy, Corporal Otto, calmly stopped Edwards and redirected him to the booking area. (*Id.* at 01:51:53–01:52:04). Edwards took a few more steps in the right direction but then abruptly turned

back around and swung at Corporal Otto with a hefty left hook.[7] (*Id.* at 01:52:05–01:52:08). Anticipating the assault, Corporal Otto grabbed Edwards and attempted to sweep his legs, losing his own footing in the process. (*Id.*). Both men then fell to the ground, with Edwards landing on top of the deputy. (*Id.* at 01:52:08–01:52:10).

Deputy Wagner, Sergeant Zimmerman, and others immediately rushed to Corporal Otto's aid, tackling Edwards and wrestling for control of his hands as he continued to strike Corporal Otto in the head. (*Id.* at 01:52:11–01:52:48). Corporal Otto eventually crawled out from under Edwards, removed the pepper spray from his utility belt, and thrusted it into the pileup, spraying Edwards in the face. (*Id.*, 01:52:49–01:53:07). Other deputies used fist and knee strikes to try to force Edwards to comply. (*Id.* at 01:52:21, 01:52:32, and 01:53:40–01:53:54). Soon, Lieutenant Fayson arrived at the scene and called over the radio for "all available officers" to come assist getting Edwards under control. (*Id.* at 01:53:11–01:53:30; Fayson Dep., Doc. 139, at 14). More deputies arrived shortly, and one of them quickly shocked Edwards with her taser. (Receiving 2 Video at 01:54:50–01:54:55). By 1:57 p.m., after nearly five minutes of

---

[7] It is not clear from the video how well Edwards's punch landed. Nurse Nadeau, who witnessed the attack from her office near the booking area, told investigators that Edwards had "clocked [Corporal Otto] right in the face," causing Corporal Otto to fall down, "smack[] his head on the concrete, and black[] out." (Nadeau Interview, Doc. 161-7, at 6). The video does show Corporal Otto's head hitting the floor, but he does not appear to lose consciousness. (Receiving 2 Video at 01:52:08–01:52:12).

struggling, the deputies finally managed to get Edwards into handcuffs. (*Id.* at 01:56:52). All told, at least twelve deputies responded to the fight, and at least nine are seen on the video actively struggling with Edwards. (*See, e.g., id.* at 01:54:44).

Once Edwards was subdued, Lieutenant Fayson called for a restraint chair, explaining later that he felt compelled to do so "for officer safety," given Edward's aggressiveness. (Fayson Dep. at 18). The deputies lifted Edwards into the chair and tightened the straps around his shoulders, waist, and ankles. (Receiving 2 Video at 01:57:15–02:00:49). Because Edwards was already in handcuffs, the deputies did not strap his hands to the chair, placing them instead through a hole in the back. (Zimmerman Dep. at 42). The deputies also placed a "spit mask" over Edwards's head to shield them from the mucus and saliva that had accumulated on his face—presumably from the pepper spray. (Receiving 2 Video at 01:59:00; Zimmerman Dep. at 47; Fayson Dep. at 24). Although some of the deputies later dabbed their own eyes with paper towels, (*see, e.g.*, Receiving 2 Video at 02:06:00), they did not wipe the pepper spray from Edwards's face or otherwise decontaminate him before putting on the spit mask, (*id.* at 01:58:55–01:59:05). They also failed to remove the taser barbs from Edwards's back. (*See* Holding Cell 9 Video at 02:26:05–02:26:15).

Many of the deputies remained in the area for the next few minutes, talking and observing Edwards as he continueed to tense up and squirm in the

12

restraint chair. (Receiving 2 Video at 02:00:56–02:07:10).[8] At one point, two of the deputies leaned down and retightened the straps around Edwards's ankles. (*Id.* at 02:02:17–02:02:53). Then, at 2:07 p.m., the deputies wheeled Edwards into Holding Cell 9 and closed the door. (*Id.* at 02:07:10–02:08:10). No deputy was specifically assigned to observe Edwards during this time, but Deputy Wagner and Sergeant Zimmerman both testified that they could see Edwards from their seated positions in the booking area. (Wagner Dep. at 34; Zimmerman Dep. at 44; *see also* Receiving Video at 02:16:45). Video footage from the cell shows Edwards moving his head and legs sporadically over the next fifteen minutes, writhing under the straps of the restraint chair. (Holding Cell 9 Video at 02:08:10–02:23:00). The video does not contain audio, and the spit mask obscures Edwards's mouth, but Deputy Wagner and Nurse Nadeau testified that Edwards was yelling unintelligibly during this period. (Wagner Dep. at 42; Nadeau Dep., Doc. 130, at 31–32).

At 2:15 p.m., Deputy Wagner walked by Holding Cell 9 and looked through the window at Edwards. (Receiving Video at 02:15:52). A minute later, he was joined by Nurse Nadeau, who peered through the window herself, looking for "signs of distress." (*Id.* at 02:16:00–02:16:10; Nadeau Dep. at 32–33). Finding none, Nurse Nadeau walked back to her office, and Deputy Wagner

---

[8] At times the deputies also appeared to speak to Edwards, but the video has no sound.

returned to his desk. (Receiving Video at 02:16:10–02:16:45; Nadeau Dep. at 33).[9] At 2:18 p.m., Lieutenant Fayson also walked by and looked into the cell, before continuing on his way. (Receiving Video at 02:17:57–02:18:05). None of the individuals who viewed Edwards during this time reported seeing any indication that he needed medical attention. (Nadeau Dep. at 33; Wagner Dep. at 42; Zimmerman Dep. at 41).

Within minutes, however, things took a turn for the worse. At 2:22 p.m., as Deputy Wagner was speaking with another deputy at his desk, an unidentified jail employee entered the receiving area and saw Edwards in Holding Cell 9. (Receiving Video at 02:22:17–02:22:25). Apparently concerned, she beckoned a passing deputy and the two approached the cell door together, observing Edwards through the window. (*Id.*, 02:22:26–02:22:52).[10] A few seconds later, the employee said something to Deputy Wagner, who quickly left

---

[9] Nadeau was asked during her deposition why she did not enter the cell at this point and perform a more thorough medical examination on Edwards. She replied that she was not allowed to do so until the deputies determined that Edwards was no longer combative. (Nadeau Dep. at 33–34). None of the Sheriff's Office Defendants were able to confirm the existence of such a rule. (Wagner Dep. at 43; Zimmerman Dep. at 48).

[10] It is not clear from the video why the jail employee was concerned about Edwards's condition. As she peered inside the cell, Edwards continued to move his legs and struggle against the straps of the restraint chair, as he had been doing on-and-off for fifteen minutes. (Holding Cell 9 Video at 02:22:17–02:22:52). It was only after the deputies entered his cell that Edwards appeared to become limp and unresponsive. (*Id.* at 02:23:20). In his deposition testimony, Deputy Wagner stated only that the employee "indicated to [him] that she had concerns about his well-being." (Wagner Dep. at 35). As one possible explanation, Nurse Nadeau told investigators shortly after Edwards's death that he had "abruptly stopped hollering. So the officer went right to him." (Nadeau Interview at 8).

his chair and approached the cell with Lieutenant Fayson. (*Id.* at 02:22:53–02:23:04). After returning to Deputy Wagner's desk to grab the keys, the two deputies entered the cell as Nurse Nadeau arrived and waited by the door. (*Id.* at 02:23:04–02:23:20).

Inside the cell, Edwards appeared lethargic and unresponsive. (Holding Cell 9 Video at 02:23:20–02:24:38). Lieutenant Fayson immediately removed the spit mask and used it to wipe Edwards's face, while Deputy Wagner applied a series of sternum rubs to no avail. (*Id.*). Soon, more deputies entered the cell and began freeing Edwards from the restraints, his limp body hunching over as they removed his handcuffs and pulled out the taser barbs still in his back. (*Id.* at 02:25:00–02:26:21). At 2:26 p.m., Nurse Nadeau entered and began administering oxygen to Edwards, who was breathing with "shallow breaths" but had a pulse of 68. (*Id.* at 02:26:20–2:27:50; Nadeau Dep. at 41). According to Nurse Nadeau, she attempted at some point to contact the charge nurse but received no response. (Nadeau Dep. at 40). A few minutes later, Nurses Robinson and Jones arrived with a stretcher, (Holding Cell 9 Video at 2:30:00), but the deputies decided to wheel Edwards to the medical unit in the restraint chair instead, (Nadeau Dep. at 43).

At 2:32 p.m., almost ten minutes after the deputies first entered Edwards's cell and found him unresponsive, they started transporting him to the medical unit. (Holding Cell 9 Video at 02:32:29). The group arrived less than

15

three minutes later, and medical personnel immediately began to assess Edwards's condition. (Medical Entrance 03 Video at 02:34:15–02:38:00). At 2:38 p.m., his condition appeared to deteriorate further, as the deputies and medical staff removed Edwards's limp body from the restraint chair, placed him on the floor, and began administering CPR. (*Id.* at 02:38:28–02:40:00). Around this time, the charge nurse asked Sergeant Zimmerman to call 911. (BCSO Report, Doc. 135-1, at 26). At 2:49 p.m., paramedics arrived and took control of the scene, continuing to administer CPR and employing other emergency measures. (Medical Entrance 03 Video at 02:49:10–03:04:20). Fifteen minutes later, the paramedics lifted Edwards onto a stretcher and transported him to Rockledge Regional Medical Center, where he was pronounced dead at 8 p.m. the next day. (*Id.* at 03:04:20–03:05:26; Autopsy Report, Doc. 141-1, at 1).

### 3. <u>The Cause of Death</u>

Exactly what caused Edwards's death remains in dispute. Dr. Sajid Qaiser, the Brevard County Medical Examiner who performed the official autopsy, listed Edward's cause of death as "excited delirium and complications due to hyperactive and violent state with subsequent restraint." (Autopsy Report at 1). As he later explained, excited delirium is a "disturbance in the cognition and the consciousness of [an] individual" that "becomes more exaggerated with combativeness, like in the fighting attitude or any kind of hyperactivity." (Qaiser Dep., Doc. 141, at 19). In this state, according to Dr.

Qaiser, "neurotransmitters in our body," such as adrenaline, "increase in level because of their increased activity and level in the blood . . . exert[ing] their effect on the heart and blood vessels" and eventually leading to cardiac arrest. (*Id.* at 21). In Edwards's case, Dr. Qaiser said, these effects were exacerbated by attempts to restrain him during his hyperactive state, including his initial detention by bystanders outside of the Walmart, his altercations with the West Melbourne police officers and the Brevard County deputies, and his eventual placement in the restraint chair. (*Id.* at 21).

Dr. Vernard Adams, a forensic pathologist hired by the Armor Defendants, agreed with Dr. Qaiser's conclusion that Edwards died from "excited delirium," though he appeared to place some blame on Edwards's preexisting "hypertensive heart disease." (Adams Dep., Doc. 142, at 12).[11] Like Dr. Qaiser, Dr. Adams opined that some of the techniques used by the deputies to subdue Edwards—including the taser, pepper spray, and restraint chair— likely contributed to his fatal adrenaline dump, "not only though pain, but also probably from fear," by keeping Edwards in a prolonged state of fight-or-flight. (*Id.* at 14–16). While these actions may have exacerbated the effects of Edwards's condition, however, Dr. Adams confirmed his belief that "the excited

---

[11] During his deposition, Dr. Adams repeatedly referred a medical report that he prepared for Defendants. That report has not been presented to the Court.

delirium that [Edwards] suffered from [when he died] was due to his schizoaffective disorder and his chronic substance abuse." (*Id.* at 14).

Dr. Daniel Schultz, the medical expert hired by Rodriguez-Bonilla, offered a different take. To start, Dr. Schultz clarified that he does not "believe in the phenomenon of excited delirium," noting that it is "not recognized by the American Medical Association or the psychiatric association." (Schultz Dep., Doc. 144, at 16–17). According to Dr. Schultz, "[w]hile a person could be delirious and excited . . . I don't ascribe to the concept that that in and of itself is the reason for the death." (*Id.* at 17). Instead, Dr. Schultz concluded that Edwards died from "rhabdomyolysis," a condition in which the breakdown of muscle tissue releases toxins into the bloodstream, damaging the kidneys and eventually leading to cardiac arrest. (*Id.* at 14).

As for the cause of this rhabdomyolysis, Dr. Schultz acknowledged that Edwards's muscles might have been damaged by his own exertions against the arresting officers and, later, the deputies. (Schultz Dep. at 16). He maintained, however, that "the primary issue [was] the tight strapping to the restraint chair . . . with a smaller component from the primary struggles that ensued prior to that." (Schultz Dep. at 20). Dr. Schultz wrote in his report that "[t]he prolonged pressure over at least roughly half a[n] hour [in the restraint chair] to large muscle groups [is] in my opinion the primary reason[]" for Edwards's rapid

decline in health. (Schultz Report, Doc. 144, at 7).[12] Dr. Schultz does not believe that the use of a taser contributed to Edwards's death, and although he suggested in his report that the combined use of pepper spray and a spit mask may have played some role in Edwards's death, Dr. Schultz later demurred, admitting: "I think I could fall back on removing that as a contributory issue. . . . [I]n retrospect, I think I would have not included that specifically on the contributory line." (Schultz Dep. at 56–57).[13]

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "However, [courts] draw these inferences only 'to the extent supportable by the record.'" *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). "Thus, the requirement to view

---

[12] Dr. Josef Thundiyil, a toxicologist hired by the Sheriff's Office Defendants, also believes that Edwards died from rhabdomyolysis. (Thundiyil Dep., Doc. 143, at 16–17). Unlike Dr. Schultz, however, Dr. Thundiyil attributes this rhabdomyolysis to Edwards's alleged "huffing" of inhalants, not to his time in the restraint chair. (*Id.* at 17–18).

[13] None of the medical experts appear to believe that Edwards died from being "suffocated very slowly and painfully" by the spit mask, as alleged in the operative complaint. (Sec. Amend. Compl., Doc. 42, ¶ 147).

the facts in the nonmoving party's favor extends to genuine disputes over material facts and not where all that exists is 'some metaphysical doubt as to material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## III. DISCUSSION

Rodriguez-Bonilla brings an exhaustive ten counts against a total of eight Defendants. The first five of these counts are brought pursuant to 42 U.S.C. § 1983, which provides for a cause of action against any person who, "under color" of state law, deprives an individual of the "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." The claims brought under this statute are: excessive force against the Deputy Defendants (Count I); deliberate indifference to a serious medical need against the Deputy Defendants and the Nurse Defendants (Count II); supervisor liability against the Deputy Defendants (Count III); failure to intervene against the Deputy Defendants and the Nurse Defendants (Count IV); and a *Monell*

claim against Sheriff Ivey[14] and Armor (Count V).[15] Notably, only Counts I and II may stand alone—Counts III–V are derivative (and in some cases, duplicative) claims that depend on the existence of an underlying constitutional violation. In other words, if the Court determines that summary judgment is appropriate on Counts I and II, the remaining federal counts fall as well.

The remaining five counts are state-law claims: willful and wanton negligence against the Deputy Defendants (Count VI);[16] ordinary negligence against Sheriff Ivey (Count VII); medical malpractice against the Armor Defendants (Counts VIII & IX); and vicarious liability against Armor itself (Count X).

The Sheriff's Office Defendants now move for summary judgment on all claims against them. The Armor Defendants move for summary judgment solely on the federal claims. Should that motion be granted, the Armor Defendants request that this Court decline to exercise supplemental jurisdiction over the remaining state-law claims and instead remand them to state court. *See* 28 U.S.C. § 1367(c)(3).

---

[14] Sheriff Ivey is sued solely in his official capacity. (Sec. Amend. Compl. ¶ 21).

[15] *Monell* established that "[l]ocal governing bodies [and officials] . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 689 (1978).

[16] In her Response to the Sheriff's Office Defendants' Motion for Summary Judgment, Rodriguez-Bonilla states that she is no longer pursuing Count VI. (Doc. 159 at 2).

## 1. <u>Excessive Force (Count I)</u>

In Count I, Rodriguez-Bonilla alleges that the Deputy Defendants violated Edwards's Fourteenth Amendment right to be free from excessive force. The Deputy Defendants deny using excessive force on Edwards and argue that regardless, they are entitled to qualified immunity.

### (a) *Qualified Immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001), *vacated on other grounds*, 537 U.S. 801, 801 (2002)). "[T]o receive qualified immunity, an official must first establish that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (quoting *Lee*, 284 F.3d at 1194). If so, "the burden

then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate." *Id.*

Here, Rodriguez-Bonilla does not contest the Deputy Defendants' assertion that they were acting within the scope of their discretionary authority during their interactions with Edwards—and any such challenge would certainly fail. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (explaining that an official acts within his discretionary function when he is "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize"). Thus, the burden shifts to Rodriguez-Bonilla to establish that (1) the facts, viewed in the light most favorable to her, show a violation of Edwards's constitutional right and (2) that right was clearly established at the time of the events at issue. *See Pearson*, 555 U.S. at 236.

(b) *Did the Deputy Defendants Violate Edwards's Rights?*

"[T]he Fourteenth Amendment guards against the use of excessive force against arrestees and pretrial detainees." *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018).[17] Rodriguez-Bonilla concedes

---

[17] By the time of his death, Edwards had not yet received a probable-cause hearing. As a result, there is some uncertainty regarding whether the Defendants' actions should be assessed under the Fourth or Fourteenth Amendment. *See Crocker v. Beatty*, 995 F.3d 1232, 1256 (11th Cir. 2021) (Newsom, J., concurring) (recognizing that Eleventh Circuit precedent "hasn't settled the issue" whether a claim "brought by an individual who has been arrested but hasn't yet received a judicial determination

that the force initially employed by the Deputy Defendants to subdue Edwards—including the use of body strikes, pepper spray, a taser, a restraint chair, and a spit mask—was not excessive, as Edwards was still resisting the deputies following his attack on Corporal Otto. (Doc. 159 at 13). She argues, however, that the Deputy Defendants violated Edwards's constitutional rights by continuing to apply force after Edwards was fully restrained. Among those alleged violations, Rodriguez-Bonilla cites: (1) keeping Edwards in the restraint chair without allowing a nurse to check his vital signs or the tightness of the straps; (2) keeping him handcuffed behind his back while in the restraint chair; (3) not removing the taser barbs in his back; (4) failing to decontaminate him after the use of pepper spray and then placing a spit mask over his head; and (5) failing to continuously observe him after he was placed in the restraint chair. (*Id.* at 13–14).

---

of probable cause . . . arise[s] under the Fourth or Fourteenth Amendment"). Since every party to this case has proceeded under the assumption that Rodriguez-Bonilla's § 1983 claims fall under the Fourteenth Amendment—and because the Eleventh Circuit has yet to direct otherwise—this Court will assess them under that standard. *See id.* at 1261–62 (Martin, J., dissenting) (noting that "[i]n the past, and in the absence of an affirmative answer as to when arrest ends and pretrial detention begins, [the Eleventh Circuit] has deferred to the characterization given by the parties, where they agree"). Indeed, following *Kingsley v. Hendrickson*, 567 U.S. 389, 397 (2015), this may be nothing more than a formalistic concern, as "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952–53 (11th Cir. 2019).

"Prior to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), . . . '[a] claim of excessive force under the Fourteenth Amendment [was] analyzed as if it were an excessive-force claim under the Eighth Amendment' and, therefore . . . a 'use of force against a pretrial detainee [was] excessive . . . if it shock[ed] the conscience' or was 'applied maliciously and sadistically to cause harm.'" *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1181 (11th Cir. 2020) (quoting *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 n.5, 1217 (11th Cir. 2009)). "In *Kingsley*, though, the Supreme Court clarified that the Eighth Amendment's malicious-and-sadistic standard—which applies to incarcerated prisoners—does not extend to pretrial detainees." *Id*. Now, "[a] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," with no additional element of subjective intent. *Kingsley*, 576 U.S. at 396–97. In other words, "[a]fter *Kingsley*, the Fourteenth Amendment's standard is analogous to [that of] the Fourth Amendment[]," not the Eighth Amendment. *Patel*, 969 F.3d at 1182; *see also Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952–53 (11th Cir. 2019) ("[I]nasmuch as it entails an inquiry into the objective reasonableness of the officers' actions, the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment.").[18]

---

[18] Rodriguez-Bonilla, apparently unaware of *Kingsley*'s doctrinal shift, argues her Fourteenth Amendment excessive-force claim under the old standard. She insists,

As in the Fourth Amendment context, assessing the "objective reasonableness" of a use of force under the Fourteenth Amendment "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Moreover, "[a] court must . . . account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

With these caveats in mind, *Kingsley* points to a number of factors that "may bear on the reasonableness or unreasonableness" of a particular use of

---

for example, that her claim requires both an "objective showing of deprivation or injury and a subjective showing that the official had a sufficiently culpable state of mind," (Doc. 159 at 11 (citing *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010))—that is, that the force was applied not "in a good-faith effort to maintain or restore discipline," but rather "maliciously and sadistically to cause harm." (*Id.* (quoting *Hudson v. McMillan*, 503 U.S. 1, 7 (1992))). Perplexingly, even after misstating the standard under which her claim will be assessed, Rodriguez-Bonilla makes no effort to show that the Deputy Defendants exhibited this malicious state of mind. Moreover, ignoring *Kingsley*, she makes no effort to establish that the force used by the Deputy Defendants was objectively unreasonable, stating (incorrectly) that "[i]n a claim for excessive force, the objective requirement is satisfied by a demonstration that the plaintiff suffered any degree of harm." (Doc. 159 at 11 (citing *Skelly v. Okaloosa Cnty. Bd. of Cnty. Comm'rs*, 456 Fed. App'x 845, 847 (11th Cir. 2012))).

force, including: "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting." *Kingsley*, 567 U.S. at 397.

Considering these factors together, there is little doubt that the Deputy Defendants' initial use of force was not excessive—as Rodriguez-Bonilla rightly concedes. Edwards, who had just initiated a violent, unprovoked attack on Corporal Otto, undoubtedly posed a grave threat to jail security and was actively resisting the Deputy Defendants' efforts to restrain him. In response, the Deputy Defendants gradually increased the severity of their force techniques as the struggle progressed, applying no more force than necessary to gain control of Edwards, and disengaging when they managed to subdue him. While the force used against Edwards—and the pain it caused him—was unfortunate, it was not unreasonable.

What happened after Edwards was placed into the restraint chair presents a closer call. "Obviously, 'legitimate interests'—including the need to 'preserve internal order and discipline' and 'maintain institutional security'—may at times require jail officers to use force." *Piazza*, 923 F.3d at 953 (quoting *Kingsley*, 576 F.3d at 397). Still, jail officials may not "continue to employ force

or other coercive measures after the necessity for such coercive action has ceased." *Id.* (quoting *Ort v. White*, 813 F.2d 318, 327 (11th Cir. 1987)).

The jail security footage makes clear that even after being subdued, Edwards continued to struggle against the straps of the restraint chair, providing no indication that he would stop fighting if he were released. Thus, it was reasonable for the Deputy Defendants to keep Edwards restrained for the twenty-five minutes that elapsed between when he was placed into the chair and when he suddenly became unresponsive in the holding cell. *See Williams v. Burton*, 943 F.2d 1572, 1574–77 (11th Cir. 1991) (finding no constitutional violation where a disruptive inmate was gagged and placed in a restraint chair for "twenty-eight and one-half hours, with brief intervals for eating, physical exercise, and toilet use"). It was also reasonable to leave Edwards's arms handcuffed behind his back, since any adjustment was likely to subject the Deputy Defendants to further assault.[19] And, given the chaotic scene that preceded Edwards's placement into the chair, the Deputy Defendants may be forgiven for not removing the taser barbs from his back before they managed to strap him down, after which his back became inaccessible. Finally, some of the actions Rodriguez-Bonilla points out—such as the Deputy Defendants' failure

---

[19] On this point, Rodriguez-Bonilla's own use-of-force expert appears to agree, stating that he would "defer . . . to [the deputies] on the scene" regarding whether Edwards's arms should have been left handcuffed behind his back or strapped into the restraint chair, given his level of resistance. (Neely Dep., Doc. 140, at 90–91).

to have a nurse physically inspect Edwards in the restraint chair, or to continuously observe him after he was placed in Holding Cell 9—are facially insufficient to constitute excessive force, even *if* they amounted to violations of internal jail policy. *See Beck v. Beck*, No. 2:12–cv–312–FtM–29SPC, 2012 WL 2792936, at *3 (M.D. Fla. July 9, 2012) ("A violation of a jail's policies does not amount to a violation of the Constitution.").

That said, at least one action of the Deputy Defendants gives this Court significant pause: their decision to cover Edwards's head with a spit mask and leave him in a holding cell for fifteen minutes without first removing the pepper spray from his face.

Considering the *Kingsley* factors once more, there was no ongoing reason to subject Edwards to the effects of the pepper spray once he was placed into the restraint chair, even as he continued to struggle against the straps in vain. And although Edwards's presence in the chair may have prevented the Deputy Defendants from giving him a full decontamination shower, they made no effort to minimize the effects of the pepper spray by washing his face with water or even simply wiping it with paper towels, as some of the deputies were doing to their own faces after the scuffle. (*See, e.g.*, Receiving 2 Video at 02:06:00). Indeed, rather than minimizing the effects of the pepper spray, the Deputy Defendants arguably exacerbated them, covering Edwards's face with a spit

mask without any indication that he was actively spitting at the deputies. (*See* Wagner Dep. at 39; Zimmerman Dep. at 47; Fayson Dep. at 24).

Finally, although Rodriguez-Bonilla's medical expert retracted his initial statement that the pepper spray and spit mask played a role in Edwards's death—which he attributed to "rhabdomyolysis," (Schultz Dep. at 56–57)—at least one medical expert maintains that the combination exacerbated Edwards's "excited delirium" "[n]ot only through pain, but also probably from fear," (Adams Dep. at 15–16). There is at least some evidence, then, that the Deputy Defendants' actions may have injured Edwards. *See Patel*, 969 F.3d at 1184 ("We [do not] think the *Kingsley* Court meant to suggest that unforeseeable injuries can transform a reasonable application of force into an excessive one. But resulting injuries can be an indicator, however imperfect, of the severity of the force that caused them." (citations omitted)).

Still, there are reasons to doubt that the Deputy Defendants' failure to decontaminate Edwards's face—irresponsible as it may have been—rose to the level of a constitutional violation, given the relatively short time in which Edwards was subjected to the effects of the pepper spray and the lack of any intelligible complaints. As the Eleventh Circuit has advised:

> Whenever the force used against a pretrial detainee consists in his subjection to hazardous conditions, the "amount of force used" is a function of two component factors—(1) the severity of those conditions and (2) the duration of his subjection to them. These two considerations combine to create a sliding scale: The more severe

the conditions, the shorter the detention need be before it amounts
to excessive force—and vice versa.

*Patel*, 969 F.3d at 1183.

Here, there is very little information regarding the severity of the
conditions to which Edwards was subjected. Because the video footage is
obscured, for example, the Court cannot tell how much pepper spray was used
or whether it was applied directly to Edwards's face. And because there is no
evidence that Edwards ever asked for his face to be decontaminated—however
unrealistic that may have been—the Court can only speculate about the amount
of pain it caused him above and beyond other sources. Indeed, the only evidence
that the pepper spray had any effect at all is the Deputy Defendants' own
testimony that there was "spit" and "mucus" on Edwards's face after the melee—
there were no reports of coughing, vomiting, or breathing problems, as one
might see after a heavy dose. And, finally, while common sense may suggest
that the addition of a spit mask would exacerbate the effects of pepper spray,
Rodriguez-Bonilla has presented no evidence that that is the case—or by how
much. A perforated spit mask, after all, is inherently designed to allow the
wearer to continue breathing.

The bottom line is this: the Court is certain that, had the identifiable
effects of the pepper spray been more severe, or had Edwards been subjected to
them for much longer than he was, Rodriguez-Bonilla might be able to show

that the Deputy Defendants violated Edwards's constitutional rights. But here, the severity of the lingering pepper spray was questionable, and Edwards was subjected to it for less than half an hour, making it more difficult to conclude that there was a constitutional violation. Were this the end of the road, analytically speaking, the Court would be forced to grapple with this uncertainty and make a definitive ruling regarding when and if the Deputy Defendants' actions crossed the line into unconstitutional territory. Ultimately, however, the second prong of the sovereign immunity test forestalls the need for such tortured analysis. Even if the Court were to conclude that the Deputy Defendants violated Edwards's constitutional rights in this case, Rodriguez-Bonilla would still need to show that these rights were "clearly established" when that violation occurred. *See Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) ("[D]iscussion of a constitutional violation may become unnecessary for qualified immunity purposes when the right was not clearly established. It is therefore not mandated that the Court examine the potential constitutional violation under . . . step one prior to analyzing whether the right was clearly established under step two.") As explained below, Rodriguez-Bonilla has not met that burden.

*(c) Was That Right Clearly Established?*

"The usual rule in a qualified-immunity case is that, in addition to proving a constitutional violation, the plaintiff must demonstrate that the law

underlying [her] claim was 'clearly established' at the time of the incident in question." *Patel*, 969 F.3d at 1185. The purpose of this rule is to "ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Lewis*, 561 F.3d at 1291 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Before *Kingsley*, there was an exception to this requirement for excessive-force claims brought under the Fourteenth Amendment based on the simple fact that the old malicious-and-sadistic standard was "so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." *Fennell*, 559 F.3d at 1217 (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002)). After *Kingsley*, however, this exception no longer applies. *Patel*, 969 F.3d at 1183 ("[A]lthough the *Johnson/Fennel* exception continues to apply to Eighth Amendment claims, we must abandon it as applied in the Fourteenth Amendment context.").

Now, as in the Fourth Amendment context, "[a] right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."

*Lewis*, 561 F.3d at 1291–92 (11th Cir. 2009). With respect to the first route, the Eleventh Circuit has advised as follows:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent.

*Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015).

Here, "case law does not provide the necessary precedent, either specifically or through broad principles, to clearly establish the right" asserted on Edwards's behalf. *Lewis*, 561 F.3d at 1292. Rodriguez-Bonilla, operating under the mistaken belief that "[t]here is no qualified immunity to claims setting forth violations of a Plaintiff's right to be free from excessive force in the custodial setting," (Doc. 159 at 12), cites only a single case that could have put the Deputy Defendants on notice that their conduct was unlawful: *Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008). But the facts of that case are distinguishable in a number of important ways.

In *Danley*, the plaintiff was brought to the jail following his arrest for drunk driving. *Id.* at 1304. After asking the deputies several times to use the restroom, the plaintiff was taken to a "small cell" with a "nasty" toilet in the corner and "no toilet paper." *Id.* The plaintiff used the toilet and exited the cell

34

but continued to complain in colorful terms about the unsanitary conditions. *Id.* The deputy replied by telling the plaintiff "to watch his language, to shut up, and to get back into" the cell from which he had just emerged. *Id.* The plaintiff responded that he was done using the toilet, but the deputy threatened to "spray" him if he did not comply. *Id.* When the plaintiff asked what that meant, the deputy sprayed him with pepper spray "for three to five seconds," pushed him back into the "small, poorly ventilated" cell, and closed the door, leaving him there for twenty minutes. *Id.* According to the plaintiff, the effects of the pepper spray were so severe that he "began having trouble breathing, started to hyperventilate, screamed and cried to the three jailers that he could not breathe, and begged to be let out." *Id.* The deputies simply "laughed at [the plaintiff] and made fun of him, . . . [holding] their hands to their necks in a 'mock-chocking' gesture." *Id.*

After twenty minutes, the deputies removed the plaintiff from the cell and allowed him to take a short, two-minute shower, which "did not permit him adequate time for effective decontamination." *Id.* The deputies then placed the plaintiff in a group cell, where his eyes "swelled so badly that he could hardly see" and his breathing became so labored that he "almost blacked out." *Id.* at 1304–05. Even after his shower, the lingering pepper spray was apparently so strong that the plaintiff's new cellmates complained about its effects on *them.* *Id.* at 1304. All told, the plaintiff spent "twelve to thirteen hours" at the jail

without adequate decontamination or medical treatment, despite repeated pleas for both. *Id.* at 1305.

Faced with these facts, the Eleventh Circuit held that the deputies in *Danley* had violated the plaintiff's Fourteenth Amendment rights, acknowledging that "subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions," including lingering pepper spray, "*can* constitute excessive force." *Id.* at 1308 (emphasis added). In that case, the court concluded, "there was no need for the jailers to continue using force after spraying him." *Id.* at 1309. Therefore, "[t]he use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell, when there were other readily available alternatives, was excessive." *Id.*

*Danley* is similar in kind to the case before this Court, but it is quite different in degree. Unlike Edwards, the plaintiff in *Danley* posed no threat to the deputies, either before or after he was pepper sprayed; he was not actively resisting the deputies, and there was no reason to think that he might try to harm them if they attempted to promptly decontaminate him. Moreover, the effects of the pepper spray on the plaintiff in *Danley* were clearly quite severe, and he communicated those effects consistently and coherently, leaving no doubt that the pepper spray was continuing to cause him significant pain and difficulty breathing. Finally, and perhaps most importantly, the plaintiff in *Danley* was subjected to the lingering effects of the pepper spray for a full

"twelve to thirteen hours" before he was released—incomparably longer than the roughly thirty minutes between when Edwards was sprayed and when he became unresponsive in his cell.[20] Although the plaintiff in *Danley*—unlike Edwards—was given a shower after twenty minutes, that shower was ineffective, prolonging the plaintiff's exposure to the pepper spray far beyond what Edwards experienced.

Ultimately, these factual distinctions are too significant for *Danley* to have clearly established "either specifically or through broad principles" that the Deputy Defendants' conduct violated Edwards's constitutional rights. *Lewis*, 561 F.3d at 1292. As the Eleventh Circuit recognized, "*Danley* certainly holds that, under certain circumstances in a prison setting, an officer violates the Fourteenth Amendment if he does not timely and adequately decontaminate . . . a prisoner who is suffering from the prolonged effects of an incapacitating chemical spray. . . . [But] *Danley* did not set out the minimum

---

[20] The Court recognizes the seeming insensitivity in suggesting that if only Edwards had protested more or lived longer, Rodriguez-Bonilla would be able to establish a claim for excessive force—especially when at least one medical expert believes that the pepper spray itself may have contributed in some way to his death. But to suggest otherwise would be to base this Court's ruling on an unknowable counterfactual. Had his condition not deteriorated, the Court cannot say whether Edwards would have continued to suffer from the effects of the pepper spray for five minutes or for five hours. All the Court knows is that, on these facts, roughly thirty minutes passed between the time Edwards was sprayed and the time he became unresponsive. The Deputy Defendants were not put on notice by *Danley* that delaying the decontamination of a combative inmate for less than half an hour would cross the line into unconstitutional territory, especially when the true effects of the pepper spray on Edwards are unknown.

decontamination procedures that the Constitution requires an officer to pursue." *J W ex rel. Williams*, 904 F.3d at 1261. And although the Deputy Defendants' failure to decontaminate Edwards sooner is regrettable, it was not, under these circumstances, "so far beyond the hazy border between excessive and acceptable force that [they] had to know [they were] violating the Constitution even without caselaw on point." *Lee*, 284 F.3d at 1199 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)).

Because their actions did not violate a clearly established constitutional right, the Deputy Defendants are entitled to qualified immunity on Rodriguez-Bonilla's claim of excessive force. Accordingly, the Deputy Defendants' Motion for Summary Judgment will be granted as to Count I.

## 2. **Deliberate Indifference (Count II)**

In Count II, Rodriguez-Bonilla alleges that both the Deputy Defendants and the Nurse Defendants violated another of Edwards's Fourteenth Amendment rights, this time by acting with deliberate indifference to his serious medical needs. Both sets of Defendants argue that even when construing all factual disputes and reasonable inferences in her favor, Rodriguez-Bonilla cannot establish that their actions (or inactions) violated Edwards's constitutional rights. The Court agrees.

*(a) Deliberate Indifference Doctrine*

The Fourteenth Amendment, like the Eighth Amendment in the post-conviction context, prohibits government officials from acting with deliberate indifference to the serious medical needs of pretrial detainees. *Goerbert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). To prove her deliberate-indifference claim Rodriguez-Bonilla needs to show that: (1) Edwards had a "serious medical need;" (2) the Defendants were deliberately indifferent to that need; and (3) that indifference caused Edwards's injury. *Id.*

A medical need is "serious" enough to satisfy the first prong if: (a) the need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994); or (b) "a delay in treating the need worsens the condition." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009). In either case, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).

As for the second prong, "[a] defendant is deliberately indifferent to a plaintiff's serious medical need when he '(1) ha[s] subjective knowledge of a risk of serious harm; (2) disregard[s] that risk; and (3) act[s] with more than gross negligence." *Patel*, 969 F.3d at 1188 (quoting *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010)). Importantly, "deliberate indifference is *not* a

constitutionalized version of common-law negligence." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (quoting *Swain v. Junior*, 961 F.3d 1276, 1288 (11th Cir. 2020)). The standard Rodriguez-Bonilla must meet to establish that the Defendants acted with deliberate indifference "is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" *Id.* (quoting *Swain*, 961 F.3d at 1288).[21]

Rodriguez-Bonilla divides her deliberate indifference claim into two distinct time periods: before Edwards's altercation with Corporal Otto, and after. The Court will address each in turn.

### (i)   Before the Altercation

With respect to the first time period, Rodriguez-Bonilla argues that "Edwards'[s] behavior before and after his arrival at the jail . . . demonstrated obvious signs and symptoms of mental illness, including agitation, anxiety[,] and paranoia." (Doc. 159 at 19). But, "[i]nstead of being given a medical and

---

[21] The Eleventh Circuit has acknowledged some "tension within [its] precedent regarding the minimum standard for culpability under the deliberate-indifference standard,"—specifically, whether the required culpability should be stated as "more than *gross* negligence," or "more than *mere* negligence." *Hoffer*, 973 F.3d at 1270 n.2. But "[t]hese competing articulations—'gross' vs. 'mere' negligence—may well represent a distinction without a difference because . . . the Supreme Court itself has likened the deliberate-indifference standard to 'subjective *recklessness* as used in the criminal law.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1970)). "Accordingly, no matter how serious the negligence, conduct that can't fairly be characterized as *reckless* won't meet the Supreme Court's standard." *Id.*

mental health evaluation, [Edwards] was placed in holding cell 7, where he waited for over thirty minutes." (*Id.* at 18). "By failing to address Edwards'[s] mental health needs" as soon as he arrived at the jail, Rodriguez-Bonilla argues, "his psychological condition deteriorated to the point that it ultimately caused the confrontation with the . . . deputies requiring the use of force." (*Id.* at 19).[22]

Even construing the facts in her favor, Rodriguez-Bonilla has not established that any Defendant was deliberately indifferent to Edwards's serious medical needs before his altercation with Corporal Otto. Assuming that Edwards's mental state at the time he entered the jail was dire enough to constitute a serious medical need—something the Defendants do not appear to challenge—Rodriguez-Bonilla has not shown that Deputy Wagner, Sergeant Zimmerman, or Nurse Nadeau knew that Edwards was at risk of serious harm, or that they disregarded that risk in a reckless manner.

As the Defendants point out, Edwards was calm and compliant when he arrived at the jail, giving no indication that he was still in the midst of the violent "psychotic episode" that led to his arrest. To the extent the Defendants did know about Edwards's mental condition, they were not "indifferent" to it. Instead, they acted on it, giving Edwards a red jumpsuit to indicate his

---

[22] Rodriguez-Bonilla appears to direct this portion of her claim solely against Deputy Wagner, Sergeant Zimmerman, and Nurse Nadeau—and with good reason: Lieutenant Fayson, Nurse Robinson, and Nurse Jones were not present until after Edwards's altercation with Corporal Otto.

assignment to the mental health unit and placing him in a solitary holding cell away from other inmates to await further processing—including a planned assessment by Nurse Nadeau. Although Rodriguez-Bonilla takes issue with the fact that Edwards was forced to wait "for over thirty minutes" before he was retrieved by Corporal Otto, (Doc. 159 at 18), such a short delay on a "quite busy" day does not enter—let alone exceed—the bounds of gross negligence. Finally, Rodriguez-Bonilla has not shown that the Defendants' actions (or inactions) somehow *caused* Edwards further injury. To the extent that she attempts to link Edwards's booking holdup to his death—a dubious causal chain to begin with— Rodriguez-Bonilla has presented no evidence that an earlier mental health assessment would have prevented his altercation with Corporal Otto rather than simply expedited it.

### (ii)   After the Altercation

After Edwards's altercation with the deputies, the problem shifted from his mental health to his physical health. According to Rodriguez-Bonilla, "Edwards'[s] serious medical needs . . . were outwardly apparent and obvious" once he was strapped into the restraint chair. (Doc. 159 at 22). Despite this, she says, both sets of Defendants "offered such cursory assistance as to amount to no treatment at all while knowing that such indifference posed a substantial risk of harm." (*Id.*; Doc. 160 at 16). As specific evidence of the Defendants' indifference, Rodriguez-Bonilla points to their failure to medically evaluate

Edwards, their failure to continuously observe him after he was wheeled into Holding Cell 9, and their failure to immediately call 911 once he became unresponsive.

Again, even construing the facts in Rodriguez-Bonilla's favor, the record does not show that the Defendants were deliberately indifferent to Edwards's serious medical needs. First, while it is now apparent that Edwards's health deteriorated at some point after he was restrained, Rodriguez-Bonilla has presented no evidence that any of the Defendants knew that he was at risk of serious harm during the fifteen minutes he spent in Holding Cell 9 before he suddenly became unresponsive. To the contrary, every one of the Defendants who observed Edwards during this time testified that he showed no signs of medical distress. (Nadeau Dep. at 33; Wagner Dep. at 42; Zimmerman Dep. at 42; Fayson Dep. at 41).[23] Second, assuming for the sake of argument that a reasonable factfinder could conclude that the risk of serious harm to Edwards was "obvious" following the various force techniques used against him, *see Goebert*, 510 F.3d at 1327, the Defendants were not deliberately indifferent to

---

[23] Although Rodriguez-Bonilla insists that Edwards was not continuously observed after he was wheeled into Holding Cell 9, video footage shows that jail personnel approached the cell window and evaluated his condition at four separate times during the fifteen minutes he spent there. (*See* Receiving 2 Video at 02:15:52 (Deputy Wagner), 02:16:00 (Deputy Wagner and Nurse Nadeau), 02:18:00 (Lieutenant Fayson); 02:22:30 (unidentified jail personnel)). Moreover, Sergeant Zimmerman testified that he could see Edwards from his office and checked on him "frequently, every couple minutes." (Zimmerman Dep. at 44).

that risk—they monitored him regularly over the course of fifteen minutes, and came to his aid as soon as his condition deteriorated.

While it would have been preferable for Nurse Nadeau to check Edwards's vital signs as soon as he was strapped into the restraint chair, her choice to wait until Edwards had calmed down did not amount to "more than gross negligence," especially considering Edwards's aggressive state and her initial impression that he was not in medical distress. *See id.* (acknowledging that "[w]here the prisoner has suffered increased physical injury due to the delay [of medical care]," the Eleventh Circuit has "consistently considered . . . the reason for the delay" in determining if a defendant acted with more than gross negligence).[24] Moreover, Rodriguez-Bonilla has provided no evidence that Nurse Nadeau would have been able to detect that Edwards was suffering from a fatal level of either "excited delirium" or "rhabdomyolysis," or that recognizing Edwards's deteriorating condition fifteen minutes earlier would have made a difference in its outcome. In other words, Rodriguez-Bonilla has failed to show that the Defendants' delay had any causal connection to Edwards's ultimate injury.

---

[24] Rodriguez-Bonilla makes much of the fact that jail policy "dictates that after each use of force . . . the inmates will be examined by a member of the medical staff" and placed under "continuous observation" for the next thirty minutes. Setting aside the question whether this policy was followed here, a "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000).

Once Edwards became unresponsive, there was no doubt that he had a serious medical need, and the risk of substantial injury to Edwards was obvious.[25] Again, however, the Defendants were not deliberately indifferent to this need—they acted on it, entering the holding cell, freeing Edwards from the restraint chair, and bringing Nurse Nadeau in to check his vital signs and administer oxygen. Rodriguez-Bonilla suggests that the Defendants should have called 911 immediately once Edwards became unresponsive—and in some sense she may be right. But the decision to allow Nurse Nadeau to evaluate Edwards and to transport him to the jail's own medical unit before calling emergency services does not meet the "onerous" bar set to establish deliberate indifference—especially given that Nurse Nadeau was actively treating Edwards during this time and reported that he was both breathing and had a pulse. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1278 (11th Cir. 2020) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar . . . ." (quoting *Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018))). Finally, although Rodriguez-Bonilla argues that the Defendants' failure to call 911 "directly caus[ed] [Edwards's]

---

[25] This appears to be the only portion of Rodriguez-Bonilla's deliberate-indifference claim for which Nurses Robinson and Jones could possibly be found liable. Although they responded to the "all available" call given by Lieutenant Fayson during Edwards's fight with the deputies, they were not assigned to booking and returned to their own areas shortly after Edwards was wheeled into Holding Cell 9. Nurses Robinson and Jones did not interact with Edwards again until they arrived with a stretcher to take him to the medical unit.

medical condition to needlessly deteriorate," she cites no evidence to support this assertion. (Doc. 159 at 24).[26]

One last point: In her Response to the Armor Defendants' Motion, Rodriguez-Bonilla appears to imply that Nurse Nadeau was deliberately indifferent to Edwards's medical needs because she did not decontaminate the pepper spray from his face, citing *Danley* for the proposition that "a jailer's refusal to permit proper decontamination violate[s] a clearly established right." (Doc. 160 at 17 (citing *Danley*, 540 F.3d at 1313)). Although *Danley* made clear that prolonged exposure to pepper spray *can* create a serious medical need, there is scant evidence that Edwards's exposure rose to that level. In *Danley*, for example, the Eleventh Circuit based its analysis on the plaintiff's allegations "that he had difficulty breathing, that his eyes burned and became so swollen he could hardly see, and that more than twelve hours after he had been sprayed

---

[26] In her Response to the Armor Defendants' Motion, Rodriguez-Bonilla does cite (rather obliquely) an "Expert Witness Declaration" made by Nurse Ashley Taylor, the charge nurse at the jail on the date of this incident. (Doc. 160 at 23). In her declaration—which was made to satisfy the pre-suit requirements for Rodriguez-Bonilla's state-law claims—Nurse Taylor states that the Nurse Defendants' conduct "delayed Edwards's ability to receive timely emergency medical care [and] directly caused Edwards' medical condition to needlessly deteriorate." (Taylor Decl., Doc. 161-5, at 2). Notably, however, Nurse Taylor does not explain how she came to this conclusion, and she stops short of stating that the Nurse Defendants' conduct caused Edwards's actual death. Indeed, at the time Nurse Taylor wrote this declaration, it was used to support Rodriguez-Bonilla's contention that Edwards died due to "respiratory distress"—a theory of death that she has seemingly abandoned. (*Id.* at 1). In any event, even if Nurse Taylor's declaration were sufficient to create a triable issue of fact on the question of causation, Rodriguez-Bonilla has failed to show that any of the Defendants was deliberately indifferent to Edwards's medical needs.

he nearly blacked out as a result of all his breathing problems," *Danley*, 540 F.3d at 1311. Indeed, the court concluded in *Danley* that the plaintiff's "inability to breathe and his bronchospasms essentially described an asthma attack." *Danley*, 540 F.3d at 1311. Here, by comparison, the only effect on Edwards readily attributable to the pepper spray was the mucus and saliva on his face.

Assuming that Edwards's exposure to the pepper spray did constitute a serious medical need—and that Nurse Nadeau knew about the substantial risk it posed to Edwards—the Court is not convinced that Nurse Nadeau's failure to decontaminate him for less than thirty minutes meets the more-than-gross-negligence standard, especially given that one "reason for the delay" was Edwards's own aggressive behavior. *Goebert*, 510 F.3d at 1327. Nurse Nadeau's conduct is certainly not comparable to that of the deputies in *Danley*, who allegedly mocked the plaintiff's cries for help, refused multiple requests for medical attention, and then left the plaintiff in lingering pepper spray for twelve to thirteen hours after an inadequate decontamination shower. *Danley*, 540 F.3d at 1304–05. Finally, to the extent Rodriguez-Bonilla is suggesting that Nurse Nadeau's failure to decontaminate Edwards caused his death, she has presented no evidence to support that theory. Indeed, Rodriguez-Bonilla's own medical expert retracted his original assessment that the pepper spray may have contributed to Edwards's demise. (Schultz Dep. at 56–57).

Ultimately, even after construing the evidence in Rodriguez-Bonilla's favor, the Court cannot conclude that the Deputy Defendants or the Nurse Defendants were deliberately indifferent to Edwards's serious medical needs in violation of the Fourteenth Amendment. Accordingly, both motions for summary judgment will be granted as to Count II.

### 3. Derivative Claims (Counts III–V)

In Counts III–V, Rodriguez-Bonilla brings a series of derivative claims against the Defendants based on their status as supervisors (Count III), their failure to intervene in an ongoing constitutional violation (Count IV), and, in the case of Sheriff Ivey and Armor, their responsibility for the policies, practices, or customs that gave rise to that violation (Count V). As noted *supra*, these claims hinge on a determination that at least one of the Defendants actually violated Edwards's clearly established constitutional rights. *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) (finding no supervisory liability where there was no underlying violation of clearly established constitutional rights); *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed."); *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation."); *Vielma v. Gruler*, 347 F. Supp. 3d 1122, 1141 (M.D. Fla. 2018) ("[A] *Monell* claim

is derivative of—and thus requires—an underlying constitutional violation."). Because the Court has determined otherwise, both motions for summary judgment will be granted as to Counts III, IV, and V.

### 4. **State Law Claims (Counts VI–X)**

In Count VI, Rodriguez-Bonilla brings a state-law negligence claim against the Deputy Defendants, alleging that they breached their duty of care towards Edwards by "wantonly and/or willfully disregarding [his] human rights and/or safety" during his time at the jail, ultimately resulting in his death. (Sec. Amend. Compl., Doc. 42, ¶ 203). In her Response to the Sheriff's Office Defendants' Motion for Summary Judgment, however, Rodriguez-Bonilla concedes that she is no longer pursuing this claim. (Doc. 159 at 2). The Motion will therefore be granted as to Count VI.

Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise [supplemental] jurisdiction over the remaining state-law claims."); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."); *Silas v. Sheriff of Broward Cnty.*, 55 F4th 863, 866 (11th Cir.

2022) ("A district court, exercising its already broad discretion, will rarely err by declining supplemental jurisdiction after the federal claims that supported its jurisdiction are dismissed."). Accordingly, Counts VII, VIII, IX, and X will be remanded to state court for further adjudication.

## IV.  CONCLUSION

The death of Gregory Lloyd Edwards was an unquestionable tragedy. And, at times, the Defendants' actions may have fallen short of the high standards of conduct we expect from government officials charged with holding—and protecting—pretrial detainees. But not every decision that might fail in hindsight to comport with the highest levels of prudence and compassion gives rise to a constitutional claim. In this case, Rodriguez-Bonilla has failed to meet her heavy burden of showing that the Defendants violated Edwards's clearly established constitutional rights. Whether they had some lower level of culpability is a question better presented to the state court. Accordingly, it is **ORDERED** and **ADJUDGED** that:

1.     The Armor Defendants' Motion for Summary Judgment (Doc. 129) is **GRANTED**.

2.     The Sheriff's Office Defendants' Motion for Summary Judgment (Doc. 131) is **GRANTED** as to **Counts I, II, III, IV, V, and VI**. The Motion is **DENIED without prejudice** as to **Count VII**.

3.     The Clerk is **DIRECTED** to enter judgment providing that Rodriguez-Bonilla take nothing on **Counts I, II, III, IV, V, and VI**.

4.     Pursuant to 28 U.S.C. § 1367(c)(3), the Court **DECLINES** to exercise supplemental jurisdiction over the remaining claims; **Counts VII, VIII, IX, and X** are therefore **REMANDED** to the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 2020-026279-CA-01.

5.     All other pending motions are **DENIED as moot**.

6.     After entry of judgment, the Clerk shall close the case.

**DONE** and **ORDERED** in Orlando, Florida, on March 6th, 2023.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties